Lynne S. TAYLOR, Plaintiff–Appellant,

and

Keisha Johnson, Plaintiff,

v.

VIRGINIA UNION UNIVERSITY, Defendant–Appellee.

Keisha Johnson, Plaintiff–Appellant,

and

Lynne S. Taylor, Plaintiff,

v.

Virginia Union University, Defendant–Appellee.

Nos. 97–1667, 97–1669.

United States Court of Appeals, Fourth Circuit.

Argued: June 9, 1999

Decided: Sept. 27, 1999

**ARGUED:** Thomas Hunt Roberts, Thomas H. Roberts & Associates, P.C., Richmond, Virginia, for Appellants. Henry L. Marsh, III, Hill, Tucker & Marsh, Richmond, Virginia, for Appellee. **ON BRIEF:** Clarence M. Dunnaville, Jr., Ephfrom R. Walker, III, Hill, Tucker & Marsh, Richmond, Virginia, for Appellee.

Before WILKINSON, Chief Judge, and WIDENER, MURNAGHAN, ERVIN,* NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER, and KING, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Chief Judge WILKINSON and Judges WIDENER, NIEMEYER, LUTTIG, WILLIAMS and TRAXLER joined. Judge MURNAGHAN wrote a dissenting opinion, in which Judges MICHAEL, MOTZ and KING joined. Judge MOTZ also wrote a separate dissenting opinion. Judge WILKINS did not participate in this case.

## OPINION

HAMILTON, Circuit Judge:

This consolidated appeal involves various claims of gender discrimination brought by two former female patrol officers with the campus police department of Virginia Union University (VUU). *See* 42 U.S.C. § 2000e–2(a)(1). The officers, Lynne Taylor (Taylor) and Keisha Johnson (Johnson) (collectively the Plaintiffs), each alleged she: (1) was delayed in receiving a firearm; (2) was not promoted; (3) was not selected to attend the police academy operated by the Virginia Commonwealth University (the Police Academy); and (4) was discharged, because she is a woman.[1]

---

* Judge Ervin heard oral argument in this case but died prior to the time the decision was filed.

1. Specifically, Johnson alleges that she was constructively discharged.

Johnson alone alleged a sexual harassment claim.

Upon VUU's pretrial motion for summary judgment, the district court dismissed Johnson's sexual harassment claim for failure to exhaust her administrative remedies. The remaining claims proceeded to trial. At the close of all evidence, the district court granted VUU's motion for judgment as a matter of law with respect to all of Taylor's claims. Johnson's remaining claims went to the jury. The jury returned a verdict fully in favor of VUU, and the district court entered judgment thereon. This appeal followed.

A divided panel of this court affirmed the judgments in favor of VUU with respect to the Plaintiffs' claims alleging discriminatory delay in receiving firearms, but reversed the judgments in favor of VUU with respect to the Plaintiffs' failure to promote, failure to be sent to the Police Academy, and discharge claims and remanded for trial on those claims with instructions to allow the admission of certain previously excluded evidence. The divided panel also instructed the district court to reinstate Johnson's sexual harassment claim. Upon VUU's suggestion, we vacated the panel decision and reheard the case *en banc.* We now affirm the judgments entered by the district court in favor of VUU in all respects and affirm its dismissal of Johnson's sexual harassment claim.

## I.

VUU's campus police department (the Department) consists of approximately twenty police officers. After a ninety-day probationary period, new hires entered the Department at the rank of patrol officer. Patrol officers could subsequently be promoted to the rank of corporal, sergeant, or lieutenant. For promotion to any rank higher than corporal, both oral and written examinations are required.

Until 1993, overall supervision of the Department was assigned to Walter H. Miller, VUU's Vice President for University Services (Department Supervisor Miller). For approximately a year thereafter, overall supervision of the Department was assigned to S. Dallas Simmons, VUU's President (Department Supervisor Simmons). In August 1994, overall supervision of the Department shifted to Anthony E. Manning, VUU's Vice President for University Relations (Department Supervisor Manning). Overall supervision of the Department included making significant personnel decisions such as hiring, firing, and promoting, with both formal and informal input from the Department's Chief of Police. However, the decision to recommend an individual for promotion to a rank above corporal was made by a panel of individuals from both inside and outside VUU. This panel consisted of individuals from the Virginia Commonwealth University's police department, the City of Richmond's police department, VUU faculty members, and certain senior officers in the Department. While the Department's Chief of Police was not a member of this panel, he would receive and forward the panel's recommendation to the Department Supervisor.

At all times relevant to this appeal, Eugene Wells (Chief Wells) served as the Department's Chief of Police. In this position, Chief Wells was responsible for the daily operation and administration of the Department, including the individual assignment of Department personnel and scheduling. Furthermore, as previously mentioned, Chief Wells had input with respect to significant personnel decisions, although the ultimate decision making authority rested with the Department Supervisor. However, Chief Wells was authorized to select who among the Department's officers could attend the Police Academy.[2]

---

**2.** VUU did not have a formal training program for its officers. However, VUU had the opportunity to send two officers each year to

the Police Academy. According to VUU policy, individuals were sent to the Police Academy based on: (1) seniority; (2) employment

Of relevance to this appeal, VUU's personnel manual required the following of a patrol officer in order to be promoted to the rank of corporal: (1) a minimum of six months as a VUU patrol officer; (2) no arrests for a criminal offense in the past twenty-four months unless found not guilty in a court of law; (3) ratings of satisfactory or above in all areas on the patrol officer's most recent performance evaluation; and (4) service with good conduct as evidenced by no disciplinary action within the previous six months. VUU's personnel manual required the following in order to be promoted to the rank of lieutenant: (1) a minimum of one year as a VUU police officer with at least one year as sergeant or of supervisory experience; (2) no arrests for a criminal offense in the past twenty-four months unless found not guilty in a court of law; (3) ratings of satisfactory or above in all areas on the most recent performance evaluation; (4) service with good conduct as evidenced by no disciplinary action within the previous twelve months; (5) submission of a letter of interest for promotion to the Department's Chief of Police; and (6) passage of qualifying oral and written examinations.

### A. Taylor.

Taylor holds a bachelor of arts degree in journalism from Norfolk State University. After receiving her degree, she served on active duty status in the United States Army for an unspecified amount of time in Germany.[3] Upon returning from Germany, Taylor attended military police school

at Fort Meade in Maryland in preparation for deployment in connection with Operation Desert Storm. Approximately two days after Taylor graduated from military police school, the conflict giving rise to Operation Desert Storm ended, thus eliminating the necessity for Taylor's expected deployment.

Apparently no longer on active duty status in the United States Army, Taylor applied for the position of patrol officer at the Department, and in August 1992, Department Supervisor Miller hired Taylor as a patrol officer upon Chief Wells' recommendation. Taylor served her mandatory ninety-day probationary period with the Department without incident. In April 1993, Wells rated Taylor's communication skills as "marginal" in a written performance evaluation and encouraged her to improve in that area. Wells rated Taylor's skills in all other areas, including initiative, dependability, and leadership as satisfactory.[4]

Despite giving Taylor a "marginal" rating with respect to her communication skills, Wells allowed Taylor to serve on a regular basis as Acting Shift Supervisor starting in August 1994. In this position, Taylor supervised all activities on the assigned shift, informed officers of Department policies and procedures as they applied to the shift, ensured compliance with Department policies and procedures, and assigned officers to work details. After serving as Acting Shift Supervisor on a number of occasions, Taylor unsuccessfully sought promotion to the rank of corporal.[5]

---

with VUU for more than ninety days; (3) experience; (4) interest; (5) desire to attend the Police Academy; and (6) written evaluations. Attendance at the Police Academy enhanced an officer's professional skills and had a positive impact on promotional opportunities above the rank of corporal.

**3.** In her brief, Taylor describes the amount of time she spent in Germany as one tour, which is commonly known to last one to two years.

**4.** At trial, Taylor's immediate supervisor during 1993 and 1994, Lieutenant Henry Yancey (Lieutenant Yancey), testified that he had

problems with Taylor "getting the job done." (J.A. 213). In addition, Department Supervisor Miller testified at trial that Taylor exhibited a "lackadaisical attitude." (J.A. 198).

**5.** Taylor admitted at trial that she did not want to be promoted to any rank above corporal. Indeed, Department Supervisor Manning testified without contradiction that Taylor informed him that she "d[id]n't want any responsibility," with respect to her employment at VUU. (J.A. 246).

According to VUU, Taylor's request for promotion was denied because of the marginal rating she had received in May 1993 with respect to her communication skills, and because she was less qualified than the male patrol officer selected for promotion. According to Taylor, most of the male officers who served as Acting Shift Supervisor were promoted to the rank of corporal. The record does not contain any evidence regarding the specific qualifications of the male officer who was promoted instead of Taylor.

Approximately two months after Taylor was denied promotion to the rank of corporal, in October 1994, Lieutenant Yancey responded to a complaint by a resident assistant that females were in the Omega fraternity room of Storer Hall in violation of VUU policy. Upon arriving at the entrance to the room, Lieutenant Yancey discovered the existence of a coed party. A member of the Omega fraternity then informed Lieutenant Yancey that one of the Department's female officers was in attendance as a guest. The officer was Taylor, who was off-duty. She had attended the party for "a little over ... an hour."[6] (J.A. 152). Her attendance was a direct violation of VUU policy regarding fraternization with students. Based upon Lieutenant Yancey's incident report and an investigation by Chief Wells, in November 1994, Chief Wells recommended to Department Supervisor Manning that Taylor be discharged. On November 7, 1994, Taylor was discharged with the stated reason being her violation of VUU's antifraternization policy.

In support of her discriminatory discharge claim, Taylor offered the testimony of Corporal Tommy Harrell (Corporal Harrell) of the Department that some male officers were not disciplined for having "contact" with female students. (J.A. 85). Corporal Harrell did not describe what type of contact was involved. Taylor also relied upon her own testimony that

"[t]here were several incidents where students would say that there were male officers who were engaged in sexual relationships with female students and bragging about it all over campus," and VUU officials did nothing. (J.A. 153).

One of the issues in this appeal stems from the fact that Taylor was never selected to attend the Police Academy. At trial, Taylor testified that Chief Wells assured her that she would be sent to the Police Academy. Nevertheless, Taylor claims that she was not sent to the Police Academy during her twenty-six month tenure with the Department because of her gender. In support of her claim, Taylor put forth the following testimony by Lieutenant Quinton Terry (Quinton Terry or Lieutenant Terry) of the Department: "I asked [Chief Wells] one day was he going to send Ms. Johnson to the Police Academy with me because I knew I was getting ready to go to the Academy. He stated to me he was never going to send a female to the Academy." (J.A. 70). Furthermore, Corporal Harrell testified that Chief Wells had once referred to Taylor as a "stupid bitch," and asked him if he was sleeping with Johnson. (J.A. 82).

### B. *Johnson.*

Johnson does not hold a college degree. She did serve two years, however, in the United States Army prior to her employment at VUU. Johnson held the rank of sergeant at the time she separated from the Army. In July 1993, Department Supervisor Simmons hired Johnson as a patrol officer upon Chief Wells' recommendation. She served the mandatory ninety-day probationary period without incident. Like Taylor, Johnson also served regularly as Acting Shift Supervisor. Johnson began doing so in April 1994. Chief Wells rated Johnson as satisfactory or above in all of the categories listed on her April 1994 performance evaluation, the only one

---

**6.** Lieutenant Yancey filed an incident report stating that Taylor attended the party and had been drinking. Taylor denies drinking any alcohol at the party.

prepared during Johnson's fourteen month tenure with the Department.

In May 1994, Johnson sent a letter to Chief Wells expressing her desire to apply for promotion to the rank of lieutenant. According to Johnson, Chief Wells then told her, "I don't know why you can't be the next lieutenant around here." (J.A. 136). To achieve that end, Johnson took both the requisite written and oral examinations. The examinations were conducted by a panel consisting of Lieutenant Yancey of the Department, a police officer from Virginia Commonwealth University's police department, and a police officer from the City of Richmond's police department. In August 1994, after the examination process was complete, VUU compiled the panel's results in a final ranking. Quinton Terry finished three points higher than Johnson and was promoted to the rank of lieutenant.

In September 1994, fourteen months after she was hired as a VUU patrol officer, Johnson sent a letter to Chief Wells expressing how much she had enjoyed working under him but was resigning to "further develop [her] career in areas that [were] more in line with [her] long term goals." (J.A. 370). Department Supervisor Manning, upon receipt of Johnson's letter of resignation, attempted unsuccessfully to persuade Johnson to remain with the Department. Department Supervisor Manning then allowed and encouraged Johnson to adjust her termination date so that she could collect an extra four days of pay.

Also at issue in this appeal is the fact that Johnson, like Taylor, was never selected to attend the Police Academy. In support of her claim that her failure to be selected to attend the Police Academy was a result of discriminatory animus held by Chief Wells toward women, like Taylor, Johnson relies upon the exchange between Chief Wells and Lieutenant Terry during which Chief Wells stated he was "never going to send a female to the Academy." (J.A. 70). The jury heard Taylor testify, however, that some of the male officers at VUU had waited as long as three years before being selected to attend the Police Academy, which was much longer than either Taylor or Johnson's respective tenures with the Department.

Also in support of her claims, Johnson testified at trial that at times during her tenure with the Department, Chief Wells: (1) talked to her in his office with the door shut; (2) told her she would be promoted if she "did the right thing"; (3) told her she looked good in her uniform; and (4) touched her on her arm or shoulder when he spoke to her. (J.A. 107).

### C. ·Equal Employment Opportunity Commission.

The Plaintiffs filed charges alleging gender discrimination against VUU with the Equal Employment Opportunity Commission (EEOC). At issue in the present appeal is the affidavit that Johnson attached to her charge in which she attested to the following:

> On several times [Chief Wells] called me at home on thing [sic] that could wait until the next day. He has touched me on the arm on several times while talking to me. He stated he hire [sic] me because he liked me. He has called my Military Reserve (Sgt.Dixon) Unit to discuss with my supervisor that he was in the process of promoting. He has called me in his office for hours at a time, away from job[sic] to talked [sic] to me.

(J.A. 353). Johnson argued below and argues on appeal that these statements in her affidavit are sufficient to conclude that she advanced a sexual harassment claim before the EEOC even though her actual charge form never explicitly alleged a sexual harassment claim. On April 1, 1996, both Taylor and Johnson received a "right to sue" letter from the EEOC.

### D. The District Court.

On June 27 and 28, 1996, respectively, Taylor and Johnson filed the present ac-

tions against VUU, which were later consolidated for purposes of trial. As previously stated, the district court dismissed Johnson's sexual harassment claim for failure to exhaust her administrative remedies and granted VUU's motion for judgment as a matter of law with respect to all of Taylor's claims. Of relevance in the present appeal, at the trial on Johnson's remaining claims, the district court refused to admit evidence, over Johnson's objection, that Chief Wells once stated that he bet a certain unidentified woman had "good pussy" and called a female VUU employee named Angela Sheridan at home on several occasions, touched her, and told her that he had looked down her blouse once when standing behind her. (J.A. 187).

Also of relevance in the present appeal is the following note sent by the jury to the district court during its deliberations:

How many women were hired, promoted, worked at VUU Campus Police during Well's [sic] tenure? Also, how many women from the VUU Campus Police went to the Police Academy during the same time?

(J.A. 343). At a conference with all parties, and outside the presence of the jury, the district court indicated how it planned to answer the jury's questions. While the court engaged in a brief discussion with the parties concerning its proposed answers to the jury's questions, no party raised any objections thereto. The district court then informed the jury in accordance with its proposed answers as follows:

All right, we had a note from the jury asking the following questions: "How many women were hired, promoted or worked at VUU Campus Police during Wells' tenure?"

My answer to that is that we have to be very careful. These are factual matters that you are supposed to decipher. But as I have indicated to counsel, and based on what I recall in my notes in the matter, there was no evidence in terms of what were the total number of women

who worked during Wells' tenure, and you are stuck with that. You can only deal with what was presented to you.

And then on the second question, I'll answer it in two ways. You want to know how many women on the campus went to the Police Academy. If your indication from that is during Wells' tenure, again, there is no evidence of the totality of women, if any, who went during Wells' tenure. And again, you are stuck with that. The only evidence that I recall relating to any specific testimony about women going to the Police Academy was Mr. Miller, who testified specifically about a Jean Robinson and a Corrinne Thomas, who were both promoted to Sergeant and both attended the Police Academy. This would have been prior to the time of Mr. Wells, Chief Wells.

So that's the best I can do for you. If it is not there, it is not there and we can't speculate. All right? Thank you.

(J.A. 335–36). No party raised any objection to these statements. The jury continued its deliberations and ultimately returned a verdict in favor of VUU on all of Johnson's remaining claims. Johnson then moved for entry of judgment as a matter of law or in the alternative for a new trial, *see* Fed.R.Civ.P. 50(b), which the district court denied. The district court then entered judgment in favor of VUU based upon the jury's verdict.

### E. *Arguments On Appeal.*

The Plaintiffs noticed timely appeals. On appeal, Taylor contends the district court erroneously granted VUU's motion for judgment as a matter of law with respect to her claims alleging discriminatory: (1) delay in receiving a firearm; (2) failure to be promoted; (3) failure to be selected to attend the Police Academy; and (4) discharge. She seeks a new trial on all of her claims.

Johnson contends the district court committed reversible error by refusing to ad-

**230**

mit evidence, over her objection, that Chief Wells once stated that he bet a certain unidentified woman had "good pussy" and called a female VUU employee named Angela Sheridan at home on several occasions, touched her, and told her that he had looked down her blouse once when standing behind her. (J.A. 187). On this basis, Johnson seeks a new trial on her claims alleging discriminatory: (1) delay in receiving a firearm; (2) failure to be promoted; (3) failure to be selected to attend the Police Academy; and (4) constructive discharge. Johnson also contends the district court erroneously dismissed her sexual harassment claim, and therefore, seeks to have the claim reinstated. We address Taylor's contentions first and Johnson's contentions second.

## II.

■ As the moving party, VUU was entitled to prevail on its motion for judgment as a matter of law with respect to Taylor's claims if during the jury trial, after Taylor was fully heard, "there [was] no legally sufficient evidentiary basis for a reasonable jury to find" in Taylor's favor. Fed.R.Civ.P. 50(a)(1). We review the district court's grant of VUU's motion for judgment as a matter of law with respect to Taylor's claims *de novo*, viewing the evidence in the light most favorable to Taylor. *See Brown v. CSX Transp., Inc.,* 18 F.3d 245, 248 (4th Cir.1994).

### A. *Failure to Promote Claim.*

■ Section 703 of Title VII of the Civil Rights Act of 1964, *inter alia,* makes it "an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). Taylor claims that she successfully met her burden of proof under the *McDonnell Douglas* burden-shifting proof scheme on her Title VII claim alleging discriminatory failure to promote on account of her gender. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McDonnell Douglas* contains a familiar three-step burden-shifting proof scheme. *See Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir.1996).

Under that three-step framework, the plaintiff-employee must first prove a *prima-facie* case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

*Id.* (internal quotation marks omitted). To meet her burden of proving pretext, a plaintiff must prove both that the reason given for the adverse action by the employer was false, and that discrimination was the real reason. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Vaughan v. Metrahealth Cos., Inc.,* 145 F.3d 197, 201–02 (4th Cir.1998).

■ In order to establish a *prima facie* case, Taylor was required to demonstrate by a preponderance of the evidence that: (1) she is a member of a protected class; (2) her employer had an open position for which she applied; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *See Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir.1995). The other two steps are not reached unless and until Taylor satisfies her burden of establishing a *prima facie* case. *See Evans,* 80 F.3d at 959.

■ At bottom, Taylor failed to offer sufficient evidence to establish the third element of a *prima facie* case—that she was qualified for the rank of corporal. The evidence at trial was undisputed that to qualify for promotion to the rank of corporal, the candidate must possess: (1) a minimum of six months as a VUU patrol officer; (2) no arrests for a criminal offense in the past twenty-four months unless found not guilty in a court of law; (3) *ratings of satisfactory or above in all areas on the patrol officer's most recent performance evaluation;* and (4) service with good conduct as evidenced by no disciplinary action within the previous six months. Taylor was not qualified for promotion to the rank of corporal because she had received a rating of "marginal" in the category of communication skills on her most recent performance evaluation. Accordingly, Taylor cannot make out a *prima facie* case, and therefore, rightly did not survive VUU's motion for judgment as a matter of law.

■ Taylor urges this court to discount her marginal rating in the category of communication skills on her performance evaluation because Chief Wells, whom she alleges harbored discriminatory animus toward women, performed the evaluation. Such a position overlooks this court's holding that if:

> the employee was hired and fired by the same person within a relatively short time span ... this fact creates a strong inference that the employer's stated reason for acting against the employee is not pretextual.... In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.

*Jiminez v. Mary Washington College,* 57 F.3d 369, 378 (4th Cir.1995) (quoting *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991)). *See also Tyndall v. National Education Centers, Inc.,* 31 F.3d 209, 215 (4th Cir.1994) (recognizing in context of the Americans with Disabilities Act, 42 U.S.C. §§ 12101—12213, that "[a]n em-

ployer who intends to discriminate against disabled individuals or holds unfounded assumptions that such persons are not good employees would not be apt to employ disabled persons in the first place"). Chief Wells was instrumental in hiring Taylor in August 1992, and evaluated her just eight months later in April 1993. While Taylor was not fired at the time of her evaluation, the same hirer-same firer inference applies here by analogy. It strains credulity to believe that Chief Wells would have falsely rated Taylor as marginal in one category in her performance evaluation only eight months after he recommended that she be hired, so that he could prevent her from being promoted to the rank of corporal because she was a woman. *See id.* at 215 (holding in ADA case that employer was entitled to same hirer-same firer inference within eighteen month time span). Further, both Department Supervisor Miller and Lieutenant Yancey corroborated Chief Wells' assessment of Taylor's poor job performance. Lieutenant Yancey testified at trial that Taylor had problems "getting the job done," (J.A. 213), and Department Supervisor Miller testified that Taylor exhibited a "lackadaisical attitude." (J.A. 198). Significantly, Taylor offered no evidence even remotely suggesting that either of these individuals held any discriminatory animus toward women. Even in the face of Chief Wells' comment that he would never send a woman to the Police Academy, these factors compel the conclusion that a reasonable jury could not find Taylor's performance evaluation to be anything other than an accurate assessment of her job performance. Because there was no legally sufficient evidentiary basis for a reasonable jury to find that Taylor was qualified for the rank of corporal, the district court properly granted VUU's motion for judgment as a matter of law on Taylor's failure to promote claim.

■ Additionally, even assuming *arguendo* that Taylor established a *prima facie* case, she did not carry her ultimate burden of offering sufficient evidence for a

reasonable jury to find that VUU's reasons for failing to promote her—her receipt of a "marginal" rating in the category of communication skills on her most recent performance evaluation and her inferior qualifications as compared to the male patrol officer selected to be promoted—were a pretext for gender discrimination. At this stage of the analysis, Taylor "must establish that she was the better qualified candidate for the position sought." *Evans*, 80 F.3d at 960. This she has unquestionably not done. Indeed, Taylor did not offer any evidence regarding the qualifications of the male patrol officer selected for the promotion she sought. Thus, she cannot even attempt to make the required comparison.

### B. *Police Academy Claim.*

Taylor next contends the district court erred in granting VUU's motion for judgment as a matter of law with respect to her Police Academy claim. In this regard, Taylor believes that she is entitled to enjoy the more advantageous standard of liability applicable in mixed-motive cases. We disagree on all fronts.

A plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if the plaintiff presents " 'direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion.' " *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)). Such a showing requires "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* If the plaintiff satisfies this evidentiary threshold, the burden of persuasion shifts to the employer to prove that "it would have reached the same determination without any discriminatory animus...." *Id.* The determination of whether a plaintiff has satisfied this evidentiary threshold is a decision for the district court after it has

reviewed the evidence, *see id.* at 1142, which "ultimately hinges on the strength of the evidence establishing discrimination." *Id.* at 1143.

The bonus for plaintiffs able to invoke the standard of liability applicable in mixed-motive cases is that proof by the employer that it would have reached the same determination without any discriminatory animus does not allow the employer to avoid liability altogether. Rather, such proof only limits the remedies available to the plaintiff. *See id.* at 1142. Absent the threshold showing necessary to invoke the standard of liability applicable in mixed-motive cases, however, a plaintiff must prevail under the less advantageous standard of liability applicable in pretext cases. *See id.* at 1143.

According to Taylor, the following testimony by Lieutenant Terry is sufficient to trigger the mixed-motive standard of liability with respect to her claim alleging discriminatory failure to be selected to attend the Police Academy: "I asked [Chief Wells] one day was he going to send Ms. Johnson to the Police Academy with me because I knew I was getting ready to go to the Academy. He stated to me he was never going to send a female to the Academy." (J.A. 70). While Chief Wells' statement reflects directly his alleged discriminatory attitude toward women, because Chief Wells made the statement in response to Lieutenant Terry's question as to whether Johnson would be joining him in attending the Police Academy, the statement obviously does not "bear directly on the contested employment decision," *i.e.*, Chief Wells' decision not to send Taylor to the Police Academy. *Fuller*, 67 F.3d at 1142. Accordingly, under our circuit precedent, the mixed-motive standard of liability is not triggered.

Taylor, therefore, bears the burden of establishing her Police Academy claim under the *McDonnell Douglas* burden-shifting proof scheme applicable in pretext cases. *See McDonnell Douglas*,

411 U.S. at 802, 93 S.Ct. 1817. To establish a *prima facie* case of disparate treatment in a pretext case, Taylor must demonstrate that: (1) she is a member of a protected class; (2) she was qualified to attend the Police Academy; (3) she was not selected to attend the Police Academy; and (4) other officers who are not members of the protected class were selected to attend the Police Academy under similar circumstances. *See Hughes,* 48 F.3d at 1383.

■ At a minimum, Taylor cannot establish the fourth element of her *prima facie* case—that other officers who are not members of the protected class were selected to attend the Police Academy under similar circumstances. Critically, during Taylor's tenure at the Department, Chief Wells never sent any VUU officer to the Police Academy with less qualifications than or similar qualifications to Taylor. During Taylor's two years of employment with the Department, there were a total of six Police Academy slots available for VUU officers (two slots each year). According to VUU policy, these slots were to be filled with officers based on their: (1) seniority; (2) employment with VUU for more than ninety days; (3) experience; (4) interest; (5) desire to attend the Police Academy; and (6) written evaluations.

The evidence is overwhelming and uncontradicted that Taylor was not as qualified as the male officers when these six criteria are considered as a whole. The evidence, viewed in the light most favorable to Taylor, shows that she served in the Department approximately two years, had a minimal amount of military experience during which she completed military police school, and, by her own admission, was only interested in being promoted to the rank of corporal, a position for which Police Academy training was unnecessary. Of the six officers selected to attend the Police Academy during Taylor's time at the Department, unlike Taylor, all expressed an interest in being promoted to the rank of sergeant or lieutenant, which

showed a high degree of professional motivation. Additionally, as compared to Taylor: (1) Vernon Dawson had more seniority and higher performance evaluations; (2) Ralph Ortiz had more seniority (the record does not disclose how his performance evaluations compared to Taylor); (3) Lieutenant Terry had higher performance evaluations and a great deal more military experience; (4) Wilfred Tegre had more seniority, higher performance evaluations, and security guard experience; (5) Troy Jones had experience as a firearms instructor, higher performance evaluations, attended the United States Marine Security Force School, and a great deal more military experience; and (6) Harper Morrison had higher performance evaluations and also had military experience, which included completion of the United States Army's military police school. Further, Taylor conceded at trial that Officers Alfred Pittman and James Anderson, both of whom are male and had more seniority than Taylor, were also not selected to attend the Police Academy during her tenure with the Department.

In sum, Taylor has not produced legally sufficient evidence for a reasonable jury to find that male officers were selected to attend the Police Academy ahead of her under similar circumstances. Indeed, she has produced no such evidence. Furthermore, Taylor has produced no evidence to rebut VUU's proffered legitimate nondiscriminatory reason for not selecting Taylor to attend the Police Academy—considering the totality of the stated factors, all of the male officers selected were more qualified. Accordingly, we affirm the district court's grant of VUU's motion for judgment as a matter of law on Taylor's Police Academy claim.

*C. Discriminatory Discharge.*

Taylor also contends that the district court erred in granting VUU's motion for judgment as a matter of law with respect to her discriminatory discharge claim. Again, we disagree.

■ Taylor premises her discriminatory discharge claim on her assertion that male officers in the Department also fraternized with VUU students but escaped discipline. For Taylor to avoid VUU's motion for judgment as a matter of law, she must, at a minimum, demonstrate a *prima facie* case of disparate treatment with respect to her being disciplined by being discharged. Thus, Taylor must demonstrate by a preponderance of the evidence that: (1) she is a member of a protected class under Title VII; (2) the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) she suffered more severe discipline for her misconduct as compared to those employees outside the protected class. *See Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993).

■ Fatal to Taylor's discriminatory discharge claim is her failure to meet the second and third elements of a *prima facie* case. The only evidence offered by Taylor in support of the second and third elements was: (1) her own testimony repeating statements by unidentified VUU students;[7] and (2) Corporal Harrell's testimony that unidentified male officers were not disciplined for having "contact" with students. (J.A. 85). Taylor's testimony merely repeating hearsay statements made by *unidentified* VUU students indicating that *unidentified* male officers were engaged in sexual relationships with *unidentified* female students without discipline by VUU and Corporal Harrell's testimony that unidentified male officers were not disciplined for having undescribed "contact" with students is too vague for a

reasonable jury to find Taylor established elements two and three of a *prima facie* case by a preponderance of the evidence. *See Guthrie v. Tifco Industries*, 941 F.2d 374, 379 (5th Cir.1991) (statements that are "vague and remote in time ... are insufficient to establish discrimination"). *Cf. Simpson v. Welch*, 900 F.2d 33, 35 (4th Cir.1990) (holding mere allegations without descriptions of specific incidents ... insufficient to state a claim under Title VII). Taylor's failure to establish a *prima facie* case is fatal to her discriminatory discharge claim.[8]

Because there is no legally sufficient evidentiary basis for a reasonable jury to find in Taylor's favor on any of her claims, we affirm the district court's grant of judgment as a matter of law in favor of VUU on all of Taylor's claims.

### III.

■ According to Johnson, she is entitled to a new trial on all of her claims that went to the jury because the district court abused its discretion in excluding evidence that Chief Wells once stated that he bet a certain unidentified woman had "good pussy" and evidence that Chief Wells called a female VUU employee named Angela Sheridan at home on several occasions, touched her, and told her that he had looked down her blouse once when standing behind her. (J.A. 187). We review a district court's exclusion of proffered evidence for abuse of discretion. *See Persinger v. Norfolk & Western Ry. Co.*, 920 F.2d 1185, 1187 (4th Cir.1990).

■ Here, we need not decide whether the district court abused its dis-

---

7. We note this testimony is inadmissible hearsay under Federal Rule of Evidence 802. However, VUU neither objected to its admission at trial nor contends on appeal that its admission was erroneous.

8. Taylor's contention that the district court erroneously granted VUU's motion for judgment as a matter of law with respect to her claim alleging discriminatory delay in receiving a firearm deserves only brief comment.

Taylor conceded at oral argument before the three-judge panel that the delay she allegedly suffered in receiving her firearm did not constitute a separate cognizable claim under Title VII. Furthermore, the record is void of evidence that VUU caused the delay that Taylor allegedly suffered in receiving a firearm. Accordingly, we affirm the grant of VUU's motion for judgment as a matter of law with respect to this claim.

cretion in excluding the evidence identified by Johnson, because assuming *arguendo* it did, the abuse constitutes harmless error. Title 28, United States Code § 2111 provides: "On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." *Id.* The Supreme Court has characterized this statute as the harmless error statute, "which applies directly to appellate courts and which incorporates the same principle as that found in [Federal] Rule [of Civil Procedure] 61."[9] *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). In order to conclude the district court's assumed evidentiary errors did not affect Johnson's substantial rights, and therefore were harmless, "we need only be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s].'" *United States v. Heater,* 63 F.3d 311, 325 (4th Cir.1995) (quoting *United States v. Nyman,* 649 F.2d 208, 211–12 (4th Cir.1980), which in turn was quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). This test appropriately focuses upon "whether the error itself had substantial influence." *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239.

We note that we have never before expressly used this particular test for determining whether an error or assumed error for the sake of argument affected an appellant's substantial rights in a civil case. Justice Rutledge first expressed this test in *Kotteakos,* a criminal case, and since then, the majority of our sister circuits have applied it in the civil context. *See Williams v. United States Elevator Corp.,* 920 F.2d 1019, 1022–23 (D.C.Cir.1990); *Schrand v. Federal Pac. Elec. Co.,* 851 F.2d 152, 157 (6th Cir.1988); *Aetna Casualty & Sur. Co. v. Gosdin,* 803 F.2d 1153, 1159 (11th Cir.1986); *Lataille v. Ponte,* 754 F.2d 33, 37 (1st Cir.1985); *Howard v. Gonzales,* 658 F.2d 352, 357 (5th Cir.1981); *Cohen v. Franchard Corp.,* 478 F.2d 115, 125 (2d Cir.1973). We now join these circuits, because we can fathom no sound justification for using a different test for determining whether a lower court's error affected an appellant's substantial rights in the civil context as compared to the criminal context. Indeed, by its own terms, § 2111 makes no distinction between civil and criminal cases, thereby implying that Congress intended uniform treatment of the statute's language in the civil and criminal contexts.[10]

Applying this test to each of Johnson's claims reveals that she is not entitled to a new trial on those claims.

**9.** Federal Rule of Civil Procedure 61 commands district courts "at every stage of the proceeding [to] disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Id.*

**10.** We recognize that three circuits have refused to apply the *Kotteakos* standard in the civil context primarily on the basis that proving harmless error in the criminal context as opposed to the civil context should be more difficult given the differing burdens of proof. *See United States Industries, Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1252–53 (10th Cir.1988), *impliedly overruled on other grounds; McIlroy v. Dittmer,* 732 F.2d 98, 105 (8th Cir.1984); *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983). As we have said, the statutory language of § 2111 implies that Congress intended uniform treatment of the harmless error statute in the civil and criminal contexts. *Cf. Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex),* 124 F.3d 619, 630 (4th Cir.1997) (holding that requirements for obtaining relief on appeal for plain error in a criminal case under Federal Rule of Criminal Procedure 52(b), one of which is that a plain error affected an appellant's substantial rights, at a minimum, must be satisfied before we would exercise our discretion to correct an error not raised below in a civil case, because the court could not conceive of any "reason why an appellant in a civil case should bear a lesser burden for obtaining correction of a forfeited error than an appellant in a criminal case...."). Accordingly, we reject the holdings and rationale of these circuits.

## A. *Failure to Promote Claim.*

 Johnson alleged that VUU denied her promotion to the rank of corporal and lieutenant because of her gender. At trial, VUU attributed Johnson's failure to be promoted to the rank of corporal or lieutenant to her not being the most qualified candidate for the positions at the time she applied for the promotions. Given that this matter proceeded through a jury trial on the merits, "we no longer concern ourselves with the vagaries of the *prima facie* case because subsequent to a trial in a Title VII action, the ultimate issue is one of discrimination *vel non.*" *Jiminez,* 57 F.3d at 377. In this "posture, the *McDonnell Douglas* paradigm of presumption created by establishing a *prima facie* case drops from the case, and the factual inquiry proceeds to a new level of specificity." *Id.* (internal quotation marks and citations omitted). This factual inquiry is whether VUU intentionally discriminated against Johnson. *See id.* Johnson bore the burden of persuasion on this issue. *See id.* To meet her burden, Johnson had to prove both that the reason given by VUU for failing to promote her was false, and that discrimination was the real reason. *See St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742; *Vaughan,* 145 F.3d at 201–02.

With respect to the rank of corporal, Johnson relied at trial on her own testimony and that of Taylor that all of the male officers who served as Acting Shift Supervisor were promoted to the rank of corporal. She also relied on the testimony of Lieutenant Terry that Chief Wells commented that he would never send a woman to the Police Academy in response to his (Lieutenant Terry's) query as to whether Johnson would be joining him at the Police Academy. Finally, she relied upon Corporal Harrell's testimony that Chief Wells referred to Taylor as a "stupid bitch," (J.A. 82), and queried whether Corporal Harrell had slept with Johnson. With respect to the rank of lieutenant, Johnson relied upon all of this same evidence, except for her own testimony and that of Taylor that all

of the male officers who served as Acting Shift Supervisor were promoted to the rank of corporal.

Additionally, the jury had before it evidence that a number of male officers, some with more seniority and experience than Johnson, served regularly as Acting Shift Supervisor without receiving promotion to the rank of corporal until they had been with the Department for several years. For example, Alfred Pittman was with the Department for four and one half years and regularly served as Acting Shift Supervisor prior to being promoted to the rank of corporal. This is a significantly longer period of time than Johnson's fourteen month tenure with the Department. Moreover, with respect to Johnson's failure to be promoted to lieutenant, the jury considered evidence that a panel consisting of three individuals with no history of discriminatory animus toward women (Lieutenant Yancey of the Department, a police officer from Virginia Commonwealth University's police department, and a police officer from the City of Richmond's police department) ranked Johnson lower than Quinton Terry, the male officer who was promoted over Johnson, after comparing their performances on written and oral examinations. Finally, the jury considered evidence that Lieutenant Terry had previously received higher performance evaluations than Johnson and had more military experience than Johnson.

The jury considered all of this evidence and concluded that Johnson had not carried her burden of persuasion: (1) that the reason given by VUU for failing to promote her to the rank of corporal or lieutenant—that she was not the most qualified candidate for either position—was false, and (2) that discrimination was the real reason. *See St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742. Considering the above outlined evidence, we are able to say with fair assurance, after pondering all that happened, that the absence of the alleged erroneously excluded evidence did not substantially sway the jury's

decision. Johnson offered the evidence of Chief Wells' alleged "good pussy" comment and the evidence of his alleged conduct toward VUU employee Angela Sheridan in support of her ultimate burden of proving that Chief Wells failed to recommend her for promotion to the rank of corporal or lieutenant because of her gender. If this evidence, assuming *arguendo* it suggests a discriminatory attitude toward women on the part of Chief Wells, had been thrown into the mix of evidence that was already before the jury on the issue of Chief Wells' discriminatory animus toward women, for example, Chief Wells' comment about never sending a woman to the Police Academy, we can say with fair assurance the outcome would have been the same. In summary, we are firmly convinced the allegedly erroneously excluded evidence, assuming *arguendo* it was admissible, was simply too weak to have made a difference in the jury's decision.

## B. *Police Academy*

Johnson also alleges that VUU prevented her from attending the Police Academy because of her gender. After a full trial, the jury returned a verdict in favor of VUU on Johnson's Police Academy claim. Thus, after considering the evidence presented by both sides, the jury was not ultimately persuaded that Johnson should prevail. Common sense compels the conclusion that if the jury rejected her Police Academy claim in the face of Lieutenant Terry's testimony that Chief Wells stated he would never send a woman to the Police Academy in response to his (Lieutenant Terry's) query as to whether Johnson would be joining him at the Police Academy, throwing the alleged erroneously ex-

cluded evidence into the mix would not have changed the outcome. In short, we say with more than fair assurance that the jury was not substantially swayed by the alleged errors. Thus, any possible error committed by the district court in excluding the evidence at issue was at most harmless.[11]

## C. *Constructive Discharge*

 Johnson also claims that she was constructively discharged because of her gender. As a threshold matter, Johnson was required to prove that VUU deliberately made her working conditions " 'intolerable' in an effort to induce [her] to quit." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353–54 (4th Cir.1995) (quoting *Bristow v. The Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985)). In order to meet this burden, Johnson had to prove: (1) VUU's actions of which she complains were deliberately done; and (2) her working conditions were intolerable. *See id.* at 1354. Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit. *See id.* Whether a plaintiff's working conditions were intolerable is assessed by the objective standard of whether a reasonable person in the plaintiff's position would have felt compelled to resign. *See Bristow*, 770 F.2d at 1255. We have previously held that "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994). Moreover, the denial of a single promotional opportunity is insufficient to create an intolerable working

11. Johnson also complains that the district court erred in refusing to submit a more favorable mixed-motive instruction to the jury with respect to her claim alleging discriminatory failure to be selected to attend the Police Academy. The record shows that the district court issued the very instructions Johnson tendered with respect to her burden of proof on this claim. Because Johnson invited any error committed by the district court in fail-

ing to give a mixed-motive instruction, she is prohibited by the invited error doctrine from obtaining any relief on appeal for any such error. *See United States v. Jackson*, 124 F.3d 607, 617 (4th Cir.1997) ("The invited error doctrine recognizes that a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such a request.") (internal quotation marks omitted).

environment. *See Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir.1999). If Johnson met her burden of showing that she was constructively discharged, she then bore the burden of showing the complained of conduct was motivated by discriminatory animus toward women. *See Vitug v. Multistate Tax Com'n*, 88 F.3d 506, 517 (7th Cir.1996).

In attempting to prove that her working conditions were intolerable, Johnson relied on her own testimony that Chief Wells touched her on the arm, called her at home on numerous occasions, talked to her in his office with the door shut, told her that she looked good in her uniform, and told her that she would be promoted if she did the right thing. She also relied on the fact that during her fourteen month tenure at VUU, she was neither selected to attend the Police Academy nor promoted. In contrast, VUU offered evidence that Johnson parted from VUU, including Chief Wells' supervision, upon extremely pleasant terms. For example, in her letter of resignation addressed to Chief Wells, she stated that she "enjoyed very much working under [his] direction. . . ." (J.A. 370). The jury considered all of this evidence and found in favor of VUU.

■ Considering the elements of proof of a constructive discharge claim and the mix of relevant evidence before the jury, we can say with fair assurance that throwing the alleged erroneously excluded evidence into the mix would not have changed the outcome. Johnson's evidence at trial fell far short of the evidence needed for a reasonable jury to find that her working conditions at VUU were intolerable. Certainly no single incident stands out in the record as sufficiently insufferable in and of itself to compel a reasonable person's departure; indeed, Johnson herself relies on the cumulative effect of the acts she has cited. But even the totality of these acts

do not support an inference that Johnson was forced to resign. The bulk of the actions on the part of Chief Wells, for example, calling Johnson at home, are moderately annoying at best, and would not force a reasonable person to resign. *See Carter*, 33 F.3d at 459. Even when these actions are coupled with her failure to be sent to the Police Academy and her failure to be promoted during her fourteen month tenure with the Department, our conclusion does not change. Critically, such failure to be sent to the Police Academy and to be promoted during such a brief tenure of employment is hardly unreasonable. *See Breeding*, 164 F.3d at 1160. Finally, beyond all of this, Johnson certainly did not part from VUU under circumstances which a reasonable jury could find that she was forced to resign. Her resignation letter belies any contention to the contrary.

The "good pussy" comment coupled with the Angela Sheridan evidence add absolutely nothing to Johnson's offer of proof with respect to her burden of proving that her working conditions were so intolerable that a reasonable person would have felt forced to resign. Indeed, the record is void of evidence that Johnson even had knowledge while employed by VUU of Chief Wells' "good pussy" comment or of his alleged conduct directed toward Angela Sheridan.

In summary, we hold that assuming *arguendo* the district court abused its discretion in excluding evidence that Chief Wells once stated that he bet a certain unidentified woman had "good pussy," (J.A. 187), and in excluding evidence that Chief Wells called a female VUU employee named Angela Sheridan at home on several occasions, touched her, and told her that he had looked down her blouse once when standing behind her, the errors were at best harmless.[12]

---

**12.** Johnson also contends that the district court erred in excluding evidence that Chief Wells solicited a prostitute in 1995, one year after Johnson left VUU. We disagree. The district court did not abuse its discretion in excluding this evidence, because the evidence was irrelevant to any issue in the case. *See* Fed.R.Evid. 401.

## IV.

Next, we consider Johnson's appeal of the district court's dismissal of her sexual harassment claim. The district court dismissed Johnson's sexual harassment claim because she had not exhausted her administrative remedies. We review the district court's dismissal *de novo*. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir.1999).

■ In order to assert a Title VII claim in federal court, a plaintiff must have exhausted her administrative remedies with respect to the claim. "Only those discrimination claims stated in the [administrative] charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *See Evans*, 80 F.3d at 963. This exhaustion requirement is meant to preserve judicial economy by barring claims that have not been sufficiently investigated following an EEOC complaint. *See McCarthy v. Madigan*, 503 U.S. 140, 144–45, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

■ Johnson's EEOC complaint did not sufficiently allege a claim of sexual harassment. The relevant portion of the affidavit that Johnson filed with her EEOC complaint reads as follows:

On several times [Chief Wells] called me at home on thing [sic] that could wait until the next day. He has touched me on the arm on several times while talking to me. He stated he hire [sic] me because he liked me. He has called my Military Reserve (Sgt.Dixon) Unit to discuss with my supervisor that he was in the process of promoting. He has called me in his office for hours at a

time, away from job[sic] to talked [sic] to me.

(J.A. 353). This passage is extremely vague. It never raises even the inference that these actions were done in a manner that had the intent or effect of sexually harassing Johnson. In fact, the actions about which Johnson complains normally occur within the employer-employee relationship. Employers normally: (1) contact employees at home; (2) hire people they like; and (3) talk to their employees for extended time periods when necessary. Furthermore, it is commonplace for an individual to touch the arm of someone with whom they are talking, for example, to emphasize a point. Accordingly, even construing Johnson's EEOC charge liberally, she did not exhaust her administrative remedies with respect to her sexual harassment claim. Therefore, we affirm the district court's dismissal of Johnson's sexual harassment claim.

## V.

Finally, we reject Johnson's contention that the district court's answer in response to the jury's second question asked during deliberations amounted to reversible error. According to Johnson, the district court's answer to the jury's second question stressed and highlighted evidence about which the jury did not inquire (that two woman from the Department had been selected to attend the Police Academy prior to Chief Wells' tenure) and minimized the facts that would have accurately answered the question posed.

■ Because Johnson failed to object to the district court's answer, we only review Johnson's allegation of error for plain error. *See Owens–Illinois, Inc.*, 124 F.3d at 630–31. Before we can exercise our discretion to correct an error not raised

Furthermore, Johnson's contention that we should grant her a new trial on her claim alleging discriminatory delay in receiving a firearm is completely without merit and warrants only brief discussion. First, Johnson conceded during oral argument before the three-judge panel that the alleged delay in her

receiving a firearm did not give rise to a separate cognizable claim under Title VII. Second, the uncontradicted evidence at trial showed that VUU had nothing to do with the delay Johnson experienced in receiving her firearm.

below in a civil case, at a minimum, the requirements of *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), must be satisfied. *See Owens–Illinois, Inc.,* 124 F.3d at 631. Under *Olano,* "a federal appellate court may exercise its discretion to correct an error not raised below ... if: (1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the court determines, after examining the particulars of the case, that the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Owens–Illinois, Inc.,* 124 F.3d at 630–31.

Johnson has failed to satisfy even the first element of *Olano.* When evaluating the adequacy of supplemental jury instructions given in response to a question asked by the jury during deliberations, "we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it." *See United States v. Stevens,* 38 F.3d 167, 170 (5th Cir.1994). Here, the jury's second question asked how many women from the Department attended the Police Academy during Chief Wells' tenure. The district court responded to the jury as follows:

And then on the second question, I'll answer it in two ways. You want to know how many women on the campus went to the Police Academy. If your indication from that is during Wells' tenure, again, there is no evidence of the totality of women, if any, who went during Wells' tenure. And again, you are stuck with that. The only evidence that I recall relating to any specific testimony about women going to the Police Academy was Mr. Miller, who testified specifically about a Jean Robinson and a Corrinne Thomas, who were both promoted to Sergeant and both attended the Police Academy. This would have been prior to the time of Mr. Wells, Chief Wells.

So that's the best I can do for you. If it is not there, it is not there and we can't speculate. All right? Thank you. (J.A. 336). We conclude this answer was reasonably responsive to the jury's second question. Indeed, the district court correctly reported the state of the evidence with respect to the jury's inquiry. Furthermore, contrary to Johnson's contention, it did so without improperly highlighting evidence unfavorable to Johnson. Finally, considering the district court's answer as just quoted and the original instructions as a whole, we are convinced the jury understood the issues before it. Accordingly, Johnson has failed to demonstrate the first element of *Olano*—*i.e.,* that the district court's answer to the jury's second question constituted error. Thus, our plain error analysis is at an end, and Johnson's challenge to the district court's answer to the jury's second question asked during deliberations fails.

## VI.

For the reasons set forth herein, we affirm the judgments entered by the district court in favor of VUU in all respects and affirm its dis-missal of Johnson's sexual harassment claim.

*AFFIRMED*

MURNAGHAN, Circuit Judge, dissenting:

Lynne Taylor and Keisha Johnson, both formerly employed as police officers at the Virginia Union University ("Virginia Union" or "University"), commenced separate actions against the University in which they sought relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq.* ("Title VII"). Taylor and Johnson allege employment discrimination based on sex. Johnson also claims that she was sexually harassed while working at the University. The cases were consolidated for trial.

The court dismissed Johnson's sexual harassment claim on summary judgment, determining that the allegations had not

been included in her original charge filed with the Equal Employment Opportunity Commission ("EEOC") and were thus procedurally barred. With respect to Taylor's complaint, the court granted the University's motion under Rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law. Finally, the court submitted Johnson's Title VII claim to the jury which rendered its verdict for the University.

Both Plaintiffs now appeal the district court's determination. Because, contrary to the majority, I believe the court erred in its judgment, I dissent.

## I.

I am in substantial agreement with the presentation of the facts as outlined in the panel decision for the case at bar and refer the reader to those portions of the decision. *Taylor v. Virginia Union University*, No. 97–1667(L), 1999 WL 98647, slip op. at 3–6 (4th Cir. February 19, 1999). I reiterate a few pertinent points below.

### A. *Lynne Taylor*

Taylor began employment as a campus police officer at the University on August 17, 1992. During the twenty-seven months that she was employed by the University, Taylor was not promoted to Corporal or sent to the Police Academy of the Virginia Commonwealth University ("Police Academy" or "Academy") for training. For promotion to Corporal, the University required that the officer under consideration rate satisfactory or above in all areas of her most recent performance evaluation. Taylor scored below satisfactory in the "Communications" category of her performance evaluation. Such a rating presumably indicated that Taylor was unqualified for promotion, yet Taylor, at least in part because of her good performance, was appointed acting shift supervisor on a regular basis. Taylor asserts that she and Johnson were the only two persons to act

as shift supervisor on a regular basis without the rank of Corporal or higher.

It is undisputed that Police Academy attendance, while not decisive, positively impacted promotion opportunities. With that in mind, according to a former police officer who testified at trial, Chief Wells stated that "he was never going to send a female to the Academy." Of the six male officers who were selected for the Academy while Taylor was employed by the police department, only three of them were hired before Taylor; three were selected for the Academy within twelve months of their date of hire; and one was selected within four months of his date of hire. While other officers who were senior to Taylor were never sent to the Academy, the reason for their non-selection is unclear. At least one such officer testified that he could not have gone to the Academy even if selected, because he did not have a high school diploma, as is required by the Academy.

The record reflects disputed testimony as to whether Chief of Police Eugene Wells alone could determine who would attend the Academy. One University Vice–President testified that the Chief of Police had to concur with his supervisor before rendering a decision. In response to an interrogatory, however, the University stated that "the Chief of Police had sole discretion as to which individuals were selected to attend the Academy."

In October 1994, two officers discovered Taylor during her off-duty hours at a fraternity party in an all-male dormitory. She was subsequently discharged by the University for fraternizing with male students, in apparent violation of University policy.

### B. *Keisha Johnson*

Johnson was hired by the University in July 1993 as a campus police officer. Johnson rated "satisfactory" or "above average" in all areas of her performance evaluation and, like Taylor, was often appointed acting shift supervisor. Also like

Taylor, Johnson was never selected for Police Academy attendance.

On May 5, 1994, Johnson wrote to Wells, indicating that she desired to participate in the promotion process and that she was applying for the position of Lieutenant. She participated in the promotion process, took a written and oral examination, and competed with several male candidates for the position. Quinton Terry, a male candidate whose examination scores exceeded Johnson's scores by three points, was selected. Terry, who commenced employment at the University on the same date as Johnson, was attending the Police Academy during the promotion process.

On September 5, 1994, Johnson resigned from the University.

## C. *Procedural History*

Taylor and Johnson commenced separate actions against the University, alleging sex discrimination in violation of Title VII.[1] Taylor alleges that she was denied the opportunity for training at the Police Academy, while male officers with less experience and/or seniority were chosen to attend the Academy; that she was denied promotional opportunities in favor of similarly situated male officers; and that she was wrongfully discharged for violating a University policy against fraternizing with students, whereas male officers violated the policy with impunity. Johnson similarly claims that she was wrongfully denied the opportunity to attend the Police Academy and, as a result, was improperly denied promotion. In addition, both Plaintiffs allege disparate treatment by the University in the issuance of their firearm. Johnson also claims that she was sexually harassed while working at the University.

The University filed motions for summary judgment in both cases. Concluding that Johnson's sexual harassment allegations had not been included in her charge filed with the EEOC and were not reasonably related to the allegations contained in the EEOC complaint, the court granted the University's summary judgment motion with respect to Johnson's sexual harassment claim only.

In addition, the University filed a motion in limine, requesting that the court preclude Plaintiffs from offering evidence that Chief Wells had been arrested in 1995 for solicitation of a prostitute. The court granted the University's motion, determining that the admission of evidence of Wells' solicitation would result in unfair prejudice to the University.

At the end of Plaintiffs' case, the University moved under Rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law with respect to Taylor's complaint. The court denied the motion, and the University called its witnesses. At the conclusion of Defendant's case, the University renewed its Rule 50(a) motion against Taylor's claims, which the court then granted. Taylor now appeals that judgment.

The court submitted Johnson's case to the jury which rendered its verdict for the University. Johnson moved to set aside the jury's verdict or, in the alternative, for a new trial, which the court denied. She appeals from the judgment entered on the jury's verdict.

## II.

Taylor argues that the district court erred by granting Virginia Union's Rule 50(a) motion for judgment as a matter of law against her claims. We review a dis-

---

1. Under Title VII, it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex...." 42 U.S.C.A. §§ 2000e–2a(1), (2).

trict court's grant of judgment as a matter of law *de novo*. *See Brown v. CSX Transportation, Inc.*, 18 F.3d 245, 248 (4th Cir. 1994). A district court may grant a Rule 50(a) motion if "there is no legally sufficient evidentiary basis" for a reasonable jury to find for the non-moving party. Fed.R.Civ.P. 50(a)(1). Judgment as a matter of law is only appropriate if, viewing the evidence in the light most favorable to the non-moving party, the court concludes that " 'a reasonable trier of fact could draw only one conclusion from the evidence.' " *Brown*, 18 F.3d at 248.

## A. Direct Evidence of Sex Discrimination

If a plaintiff can present sufficiently direct evidence of discrimination, she qualifies for the more advantageous standard of liability applicable in mixed-motive cases. *See Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir.1995). The contours of the mixed-motive inquiry were originally outlined in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In *Price Waterhouse*, the Supreme Court determined that if a plaintiff showed by direct evidence that gender played a motivating part in an adverse employment decision, she became entitled to a shift in the burden of persuasion. 490 U.S. at 250, 109 S.Ct. 1775. Upon such a showing, the defendant-employer could then avoid liability only by demonstrating by a preponderance of the evidence that it would have reached the same decision absent any discrimination. *Id.* at 258, 109 S.Ct. 1775.

The Civil Rights Act of 1991 modified the Supreme Court's holding in *Price Waterhouse*. 42 U.S.C.A. § 2000e–2(m). Under the Act, an employer can no longer avoid liability simply by proving that it would have made the same decision for nondiscriminatory reasons. Instead, liability attaches whenever sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e–2(m); *see also Fuller*, 67 F.3d at 1142. Proof by the employer that it would have reached the same determination in the absence of discriminatory animus only limits the remedies available to the plaintiff.[2] *See Fuller*, 67 F.3d at 1142.

In order to recover under the mixed-motive inquiry, the plaintiff must present " 'direct evidence that decisionmakers placed a substantial negative reliance on an illegitimate criterion.' " *Id.* Such a showing requires "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and bear directly on the contested employment decision." *Id.*

With this standard in mind, Taylor should receive the benefit of the mixed-motive inquiry with respect to Virginia Union's failure to afford her an opportunity to attend the Police Academy. Chief Wells reportedly told Officer Terry that "he was never going to send a female to the Academy." Despite the majority's assertion to the contrary, Wells' statement directly relates to his refusal to send Taylor to the Academy. The command that the evidence in question "bear directly on the contested employment decision" merely requires that there be some direct link between the challenged decision and the alleged discriminatory attitude; it does not bar the use of inferential deductions altogether. It is difficult to imagine more direct evidence than an unequivocal statement by Chief Wells that he would never send a woman to the Police Academy. Sure enough, consistent with his promise,

**2.** Under 42 U.S.C.A. § 2000e–5(g)(2)(B), if an employer demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor, the court— (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A)."

Wells did not select Taylor to attend the Academy; nor did he select any woman to attend the Academy during his tenure as Chief of Police. Wells' statement both reflects his alleged discriminatory attitude, as the majority acknowledges, and bears directly on his decision not to send Taylor to the Police Academy. Such direct evidence of discriminatory intent justifies application of the mixed-motive analysis.

The University first argues that Appellant is not entitled to the mixed-motive analysis because Wells alone could not make decisions regarding Academy attendance. In response to an interrogatory, however, the University stated: "Prior to March, 1995, the Chief of Police had sole discretion as to which individuals were selected to attend the Academy." In testimony, Walter Miller, Vice-president for University Services, contradicted the interrogatory response, insisting that "[t]he Chief of Police has never had sole discretion as to who attended the Police Academy. That was also put before the supervisor of the Chief of Police and they both concurred unanimously or together." When considering a Rule 50(a) motion, the court must view the evidence in a light most favorable to the non-movant. Here, viewing the evidence in a light most favorable to Taylor, a jury could reasonably conclude that Chief Wells was primarily, if not solely, responsible for selecting officers to attend the Academy. Since such a jury conclusion is plausible and would not be an unreasonable interpretation of the record evidence, it was improper for the district court to grant the Rule 50(a) motion for judgment as a matter of law.

Even assuming the veracity of the University's claim, its reliance on the fact that Wells made decisions regarding Academy attendance in concert with other officials is misplaced. One need look no further than *Price Waterhouse*, where the employer's decision to deny the plaintiff partnership was made by a policy board, for evidence that cooperative decision-making does not immunize an employer from liability. The board in *Price Waterhouse* received a recommendation regarding the plaintiff's promotion to partner from a committee that had, in turn, received comments from other partners in the firm. 490 U.S. at 232–233, 109 S.Ct. 1775. The fact that the employment decision was made in concert with others who may not have shared the discriminatory motivations did not matter. *See id.* at 256, 257, 109 S.Ct. 1775. Similarly, the fact that Chief Wells alone may not have made Academy decisions does not necessarily negate the substantiality of the University's reliance on an illegitimate criterion, i.e., gender. Where, as here, Wells' recommendation contributed significantly to the ultimate determination regarding Academy attendance and the University does not disclaim reliance on Wells' recommendation, it is inconsequential that he did not make the decision alone.

Second, the University argues that there is a legitimate, non–discriminatory reason that explains why Taylor had not yet been selected for the Academy: namely, Academy openings were few, and male officers more senior than Taylor had not yet been selected for the Academy. Under the modification to *Price Waterhouse* made by the Civil Rights Act of 1991, it does not matter that other legitimate reasons exist for not sending Taylor to the Academy. An employer cannot avoid liability by proving that it would have made the same decision for nondiscriminatory reasons. 42 U.S.C.A. § 2000e–2(m); *see also Fuller*, 67 F.3d at 1142. Therefore, the University's questionable explanation that Taylor had not amassed enough seniority[3] does not absolve the institution of liability.

Finally, Defendant hints that an isolated comment like the one made by Chief Wells is excluded from coverage under the mixed-motive analysis. To the contrary, there is no such requirement that a pattern of such discriminatory comments

---

3. As I explain below, the University's suggestion that Taylor simply did not have sufficiently senior status to attend the Academy is not supported by the facts.

must be demonstrated before a claim is actionable. In fact, the Supreme Court in *Price Waterhouse* specifically refrained from deciding which specific facts would or would not establish a plaintiff's case. 490 U.S. at 251–252, 109 S.Ct. 1775.

Under the circumstances, Taylor is entitled to application of the mixed-motive analysis.[4] Examining the evidence in a light most favorable to Taylor, a reasonable jury could find in her favor. The district court's grant of the University's Rule 50(a) motion was, therefore, improper.

### B. *Circumstantial Evidence of Sex Discrimination*

Under *McDonnell Douglas,* a plaintiff can establish a presumption of unlawful discrimination through circumstantial evidence by demonstrating a *prima facie* case of discrimination. 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff establishes a *prima facie* case, the court must rule in favor of the plaintiff unless the defendant-employer provides a legitimate, nondiscriminatory reason for the adverse employment action. *See id.* at 802–805, 93 S.Ct. 1817; *see also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer meets its burden, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to show that the proffered reason is a pretext to mask unlawful discrimination. *See McDonnell Douglas,* 411 U.S. at 802–805, 93 S.Ct. 1817.

### 1. Failure to Promote

Taylor alleges that she was denied promotion to the rank of Corporal because of her sex. Taylor insists that she was required to assume the duties of the position, but without the rank or usual pay increase. To establish a *prima facie* case for failure to promote, the plaintiff must show that: (1) she is a member of a protected group; (2) she sought the position in question; (3) she was qualified; and (4) she was rejected under circumstances giving rise to an inference of unlawful discrimination. *See Carter v. Ball,* 33 F.3d 450, 458 (4th Cir. 1994); *McNairn v. Sullivan,* 929 F.2d 974, 977 (4th Cir.1991).

Elements (1) and (2) of the *prima facie* test are undisputed. Elements (3) and (4), however, are the subject of disagreement. With respect to the third element, Virginia Union argues that Taylor was not qualified for promotion to the rank of Corporal because, according to the police department's promotion policy, no officer can be promoted if she does not rate satisfactory or above in all areas of her most recent performance evaluation. Taylor's performance evaluation in April 1993 indicated that she received an unsatisfactory rating in the area of "Communications," so, the

---

**4.** Even if we were to find the *Price Waterhouse* mixed-motive inquiry to be inapplicable to the instant case, I would reach the same result under the more rigorous test set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As the majority explains, to establish a *prima facie* case of disparate treatment under the *McDonnell Douglas* scheme, Taylor must demonstrate that (1) she is a member of a protected class; (2) she was qualified to attend the Police Academy; (3) she was not selected to attend the Police Academy; and (4) other officers who are not members of the protected class were selected to attend the Police Academy under similar circumstances. *See Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir.1995). The majority argues that Taylor cannot satisfy the fourth element of the *prima facie* test, since "[t]he evidence is overwhelming and uncontradicted that Taylor was not as qualified as the male officers" who were selected. I do not share the majority's enthusiasm regarding the strength of the evidence. Taylor completed two years of college at the University of Oklahoma and ultimately received a Bachelor of Arts degree in journalism from Norfolk State University. She then went on active duty in the military and, after a tour in Germany, completed the U.S. Army military police school at Fort Meade. The record evidence indicates that Taylor was, at least, as qualified as her male counterparts. Given Taylor's credentials, the majority's suggestion that the evidence of Taylor's lack of qualification is "overwhelming and uncontradicted" is confusing, at best.

University asserts, she was not eligible for consideration for promotion to Corporal.

Taylor, on the other hand, argues that the fact that she was required to perform many of the functions and responsibilities of Corporal and to supervise male officers who were arguably "more qualified" than her evidences that she was, in fact, qualified for the promotion. Taylor suggests that Chief Wells gave her an "unsatisfactory" rating "because of his animus towards women." The evidence, particularly when considering the improperly excluded evidence of Wells' derogatory comments about women and prior harassment of a female employee (see below), tends to suggest that Chief Wells may have had a discriminatory motive for giving her a negative evaluation. Moreover, the continuous appointment of Taylor as acting shift supervisor suggests that Chief Wells was satisfied with Taylor's performance, notwithstanding his evaluation to the contrary. Indeed, most male officers who were consistently appointed as acting shift supervisor were promoted to Corporal. Viewing the evidence in the light most favorable to Taylor, a reasonable jury might conclude that Taylor was qualified despite her "unsatisfactory" rating given the increased responsibility assigned to her.

To satisfy the fourth element of the *prima facie* test, Taylor must show that she was rejected for promotion under circumstances that raise an inference of unlawful sex discrimination. Toward that end, Taylor argues that she was denied opportunities for training by Chief Wells' unwillingness to select a female for the Police Academy,[5] which limited any possible promotion opportunities. In addition, Corporal Tommy Harrell testified that Chief Wells called Taylor "a stupid bitch" and asked him if he was sleeping with Taylor. While the evidence does not prove discriminatory conduct with respect to the

promotion decision, it is strongly suggestive of discriminatory intent. *See, e.g., Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999) (noting that "gender-based insults, including the term 'bitch,' may give rise to an inference of discrimination based on sex"); *Walsdorf v. Board of Commissioners for the East Jefferson Levee District*, 857 F.2d 1047, 1052 (5th Cir.1988) (granting Title VII relief to female employee based upon evidence which included statement by supervisor that "ain't no bitch gonna get this job"). Keeping in mind that the test to establish a *prima facie* case is not intended to be onerous, *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the facts as presented by Taylor sufficiently demonstrate that she was denied promotion under circumstances giving rise to an inference of unlawful discrimination.

The majority maintains that because Chief Wells played a role in hiring Taylor, he could not have acted discriminatorily when considering her for promotion. Under the cases cited by the majority, when the plaintiff is hired and fired by the same individual and the termination of employment occurs within a relatively short time span following the hiring, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) (age discrimination case); *see also Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir.1996) (extending "same actor inference" to Title VII gender discrimination). The majority insists that the "same actor inference" applies by analogy to the failure to promote at issue here. First, notwithstanding this Court's suggestions in earlier cases, I am not convinced that the "same actor inference," which is typically applied in the termination context, is equally powerful when applied to a

---

**5.** As stated above, Wells proclaimed to another officer that he would never send a female officer to the Academy.

charge of discrimination with respect to a decision not to promote an employee. *But see Evans*, 80 F.3d at 959 (noting, in panel decision, that because the person accused of discrimination was also the person who hired plaintiff, "there is a 'powerful inference' that the failure to promote her was not motivated by discriminatory animus"). The thought of an employer hiring an individual in a protected class and, for discriminatory reasons, keeping that person in an entry-level station, i.e., hindering the employee from advancing to the ranks of management or into a higher paying position, is not nearly as incredulous as the majority urges. It does not require a stretch of the imagination to discern such a possibility. Consequently, the fact that Wells hired Taylor does not necessarily mean that he did not act with discrimination in evaluating her or in considering her for promotion.

Second, even assuming the existence of a "strong inference" that discrimination did not motivate Wells, Taylor "still has the opportunity to present countervailing evidence of pretext." *Proud*, 945 F.2d at 798. The inference is rebutted when the plaintiff presents sufficiently compelling evidence of discrimination. *See id.* For example, the inference does not apply when plaintiff presents evidence of overt discrimination in the form of derogatory comments about women. *See Madel v. FCI Marketing, Inc.*, 116 F.3d 1247, 1253 (8th Cir.1997) (declining to apply inference where plaintiff presented evidence of overt discrimination in form of derogatory comments about age). Evidence of such comments by Wells and his outright refusal to send a woman to the Academy weaken the presumption of nondiscrimination.

Since Taylor demonstrated that she was denied promotion under circumstances giving rise to an inference of unlawful discrimination, Virginia Union must provide a legitimate, nondiscriminatory reason for its action. By way of explanation, the University submits that Taylor was indeed unqualified, as evidenced by her evalua-tion. It further maintains that the number of available Police Academy positions is limited to two officers each year. Many male officers with more seniority than Taylor, the University explains, also were denied an opportunity to attend the Academy, while other officers were required to wait a period of three years. The record suggests otherwise, however. During Taylor's employment with the police department (August 17, 1992 through November 7, 1994), six male officers were selected to attend the Academy—thus, contradicting the University's declaration that only two officers per year were selected for attendance. Only three of the six officers were hired before Taylor; three were selected for the Academy within twelve months of their date of hire; one officer was selected within four months of his hire date. As to the officers senior to Taylor who were never sent to the Academy, the reason for their non-selection is unclear. At least one of these officers testified that he could not have gone to the Academy even if selected because he did not have a high school diploma, which the Academy requires for participation.

On these facts, a trier of fact could reasonably conclude that Virginia Union's explanation is a mere pretext for unlawful discrimination and that Taylor was, in fact, denied training opportunities and promotion because of her sex. It was, therefore, inappropriate for the district court to grant the University's motion for judgment as a matter of law.

## 2. Discriminatory Disciplinary Measures

In October 1994, Taylor was discovered in attendance at an on-campus fraternity party by two other officers. The University discharged Taylor in November 1994 for allegedly violating Virginia Union's policy that prohibits fraternization between campus police officers and students. Taylor argues that she was wrongfully discharged based upon a disparate application of the policy.

To establish a *prima facie* case of sex discrimination in the enforcement of employee disciplinary measures, Plaintiff must show that (1) she is a member of the class protected by Title VII; (2) the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) the disciplinary measures enforced against her were more severe than those enforced against those other employees. *See Cook v. CSX Transportation Corp.,* 988 F.2d 507, 511 (4th Cir.1993); *Moore v. City of Charlotte,* 754 F.2d 1100, 1105–1106 (4th Cir.), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). Taylor obviously satisfies prong (1) of the test, but prongs (2) and (3) are in dispute.

Taylor maintains that male officers fraternized with female students, sometimes even engaging in sexual relations, but were not disciplined for their misconduct. Taylor's contention that male officers engaged in more egregious violations of the policy in question is supported by Corporal Harrell's testimony that male officers had contact with female students and were not disciplined. Contrary to the majority's assertions, the testimonies of both Taylor and Harrell were sufficiently certain in their content that a reasonable jury could find that Taylor established a *prima facie* case. Harrell's testimony was in direct response to a query from Taylor's counsel regarding male officers' fraternization with female students. Harrell testified unmistakably that such contact between male officers and female students had, in fact, occurred and that the male officers were not disciplined. I, perhaps, cannot conclude from Harrell's testimony that these officers engaged in sexual relations with students, but I do find in his testimony indisputable support for Taylor's contention that male officers engaged in misconduct for which there was no punishment. How that testimony is weighed is a jury decision that should not be resolved on a motion for judgment as a matter of law.

Viewing the evidence in a light most favorable to Taylor, her alleged violation of the non-fraternization policy was, at minimum, comparable in seriousness to misconduct by male officers. Yet, the disciplinary action enforced against her was more severe. On these facts, Taylor's claim should have survived a Rule 50(a) motion. The district court erred in deciding otherwise.

### III.

Johnson argues that the district court erred in refusing to admit certain evidence. The trial judge excluded evidence of Wells' arrest for solicitation of a prostitute on the ground that it would be unduly prejudicial to Defendant. In chambers, the judge also declined to admit evidence of Wells' alleged harassment of another female employee. Finally, during the trial, the judge sustained the University's objection to questions from Johnson's counsel regarding demeaning statements Chief Wells allegedly made regarding other female employees.[6] We review the trial court's decision to exclude evidence for abuse of discretion. *See Persinger v. Norfolk & Western Ry. Co.,* 920 F.2d 1185, 1187 (4th Cir.1990). Where an evidentiary ruling affects the substantial rights of the parties, appellate intervention may be necessary. *See Mullen v. Princess Anne Volunteer Fire Co., Inc.,* 853 F.2d 1130, 1131, 1135 (4th Cir.1988).

I find no error in the trial judge's decision to exclude evidence of Wells' arrest for soliciting a prostitute. Given the fact that the arrest occurred a year after Johnson's resignation, its relevance is suspect. Since the arrest does not, in any way, make it more or less likely that Wells was influenced by discriminatory motivations in the workplace, its exclusion was appropriate.

---

**6.** The evidence suggests that Chief Wells often referred to women in derogatory terms, once stating that a certain woman "ha[d] good pussy."

However, the judge's failure to admit evidence regarding Wells' derogatory comments about women is erroneous. In order to demonstrate employment discrimination on the basis of sex, Johnson must show that illegitimate gender considerations were a motivating factor in the employment decision. Wells' use of degrading language in reference to women is relevant in determining whether sex stereotyping supported the decision. *See id.* at 1133 (determining that "use of racially offensive language by the decision-maker is relevant as to whether racial animus was behind the [employment] decision, and was proper evidence for the jury to consider"). His statements reveal his state of mind, even if they do not relate to the specific employment decision at issue, and are admissible on that basis. *See id.* at 1134; *see also* Fed.R.Evid. 404(b) (noting that evidence of prior acts which would otherwise be inadmissible may be introduced to show motive, intent, or knowledge).

The University argues that the evidence was properly excluded since Federal Rule of Evidence 403 allows the district court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. I disagree. Johnson attempts to prove Chief Wells' discriminatory intent, so the probative value of statements revealing Wells' stereotypical view of women significantly outweighs any risk of prejudice against the University. *See Mullen,* 853 F.2d at 1133 ("Where a plaintiff seeks to prove discriminatory intent, the probative value of statements revealing the racial attitudes of the decision-maker is great. This is so because of the inherent difficulty of proving state of mind."). Indeed, the Fourth Circuit has correctly noted that "Rule 403 simply erects no per se barrier to the introduction of customary mannerisms of speech that may shed light on the motives of a contested decision. Such evidence may be the only way in which discriminatory attitudes are revealed...." *Id.* at 1134. Here, since the evidence in question is central to a key element of Johnson's case, we can only conclude that the probative value of the evidence outweighs any danger of unfair prejudice.

Similarly, evidence that Wells sexually harassed another female employee[7] is also relevant to a determination of discriminatory intent. Contrary to the University's assertions, it does not matter that sexual harassment was not an issue before the court. Evidence of prior sexual harassment, although not the subject of a distinct claim, may constitute relevant background evidence in a proceeding in which sex discrimination is at issue. *See Evans,* 80 F.3d at 963 (noting that while untimely filed "allegations [of sexual harassment] cannot stand as separate charges of discrimination for which [the employer] may be liable, they might be admissible as evidence at trial to support [plaintiff's] properly asserted sex discrimination claim"). Consequently, it was improper for the trial judge to exclude outright such evidence.

I am persuaded that the exclusion of Wells' derogatory statements and prior harassment of a female employee " 'affect[ed] the substantial rights of the parties.' " *Mullen,* 853 F.2d at 1135. Admission of the evidence may have yielded a different result, since the jury had before it very limited corroborating evidence from which it could gauge Wells' motivation in making certain employment decisions and the working conditions that led to Johnson's departure. I, therefore, cannot say that the error was harmless. Reversal of the district court's evidentiary decision is appropriate, and a new trial is warranted.[8]

---

7. The evidence indicates that Wells had frequently called a former female employee at home, touched her, and told her that he had looked down her blouse once when standing behind her—conduct strikingly similar to that charged by Johnson.

8. I need not address Johnson's contention that the district court's answers to certain jury questions constituted reversible error, since I already have suggested that we remand the case for a new trial.

## IV.

Finally, Johnson asserts that she raised the issue of sexual harassment in her EEOC Charge of Discrimination, so the district court's dismissal of her claim for failure to exhaust administrative remedies was erroneous. A review of the record reveals that Johnson did not mention her claim of sexual harassment in her initial administrative charge, but she did make the following statement in her affidavit filed in support of her charge:

> On several times [Chief Wells] called me at home on thing that could wait until the next day. He has touched me on the arm on several times while talking to me. He stated he hire [sic] me because he liked me.... He has called me in his office for hours at a time, away from job to talked[sic] to me.

The district court found that "the affidavit accompanying the EEOC complaint is not sufficient to put the EEOC or Defendant on notice regarding Ms. Johnson's sexual harassment claims. Her sexual harassment allegations in her Complaint are not reasonably related to her allegations in the EEOC Complaint." I disagree.

The allegations contained in the administrative charge of discrimination dictate the scope of any subsequent judicial complaint. *See Evans,* 80 F.3d at 962–963. "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Id.* at 963. Any "reasonable investigation" of an EEOC complaint would surely include an investigation of facts alleged in an affidavit filed in support of the complaint. It is, therefore, appropriate to consider Johnson's statements in her sworn affidavit. *See Emmons v. Rose's Stores, Inc.,* 5 F.Supp.2d 358, 363 (E.D.N.C.1997) (looking to both EEOC Charge and affidavit to determine whether sexual harassment claim filed with EEOC), *aff'd,* 141 F.3d 1158 (4th Cir.1998); *see also Gipson v.*

*KAS Snacktime Co.,* 83 F.3d 225, 229 (8th Cir.1996) (considering both EEOC Charge and supporting affidavit to determine whether racial harassment claim sufficiently stated); *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 502 (7th Cir. 1994) (determining that in assessing scope of EEOC Charge, court may consider statements in sworn affidavit); *Clark v. Kraft Foods, Inc.,* 18 F.3d 1278, 1280 (5th Cir.1994) (considering affidavit in determining whether EEOC reasonably could be expected to investigate disparate treatment claim).

Construing Johnson's EEOC Charge and affidavit "with utmost liberality," *Alvarado v. Board of Trustees of Montgomery Community College,* 848 F.2d 457, 460 (4th Cir.1988), we believe that Johnson alleges conduct sufficient to state a claim for sexual harassment. The EEOC defines sexual harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a) (1998). When construed liberally, the allegations that Wells told Johnson that he liked her, touched her, summoned her into his office for hours at a time, and called her at home may be considered to be of a sexual nature. Title VII does not require that lay complainants outline their charges with any greater precision. *Alvarado,* 848 F.2d at 460 (" 'EEOC charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.' "). I, therefore, find that the district court erred in dismissing Johnson's claim for failure to exhaust administrative remedies.

## V.

For the reasons stated above, I conclude that the district court granted the Univer-

sity's Rule 50(a) motion for judgment as a matter of law against Taylor's claims, excluded certain relevant evidence during Johnson's trial, and dismissed Johnson's sexual harassment claim in error. On these grounds, I believe the district court decision should be vacated.

Judges Michael, Motz and King join in this dissent.

DIANA GRIBBON MOTZ, dissenting:

I join Judge Murnaghan's compelling dissent. It persuasively demonstrates why the judgment of the district court should be reversed. I write separately to address a single point. Although the subject is distasteful, I feel compelled to voice my strong objection to an argument vigorously pressed by VUU.

The evidence of Chief Wells' animus toward women went unrebutted at trial, but the district court excluded what I believe was the most powerful evidence of this animus. Specifically, the district court excluded testimony that Chief Wells commented that he "bet" a woman "ha[d] good pussy." The majority holds exclusion of this evidence was harmless, a conclusion with which I do not agree but which I understand.

VUU, however, pressed a very different contention. Although at oral argument (but not in its appellate brief) the university fleetingly asserted harmlessness, its principal contention was that exclusion of this statement was proper because the statement was purportedly irrelevant. The remark was irrelevant, VUU maintained, because Chief Wells made it "to another male employee without a female being in the presence." The university explained that "this is [a] kind of man talk situation. When men get together and talk they say certain things. Certainly the plaintiff had no way of knowing this comment was ever made."

If a supervisor's own words reflect the illegal bias he is accused of harboring, those words generally constitute strong, direct evidence of that animus, admissible in an employment discrimination action brought against him. *See Mullen v. Princess Anne Volunteer Fire Co.* 853 F.2d 1130, 1133 (4th Cir.1988). Such evidence does not become irrelevant just because the supervisor did not make the offensive remarks in front of those he is accused of victimizing, or because the plaintiff did not know of the remarks. *See e.g. Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 108–111 (3d Cir.1999) (finding admissible in sex-discrimination suit testimony "about 'locker-room conversations between men outside the presence of women'" even though plaintiff had no knowledge of the conversations until after she filed suit). Rather, a trial court abuses its discretion when it excludes evidence demonstrating racial or gender animus solely because the statements were made between members of the same race or gender. *See, e.g., Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1249 (6th Cir.1995) (exclusion of evidence of racial slurs made in private by white supervisors to white employees is abuse of discretion requiring reversal); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 873 (11th Cir.1985) (same).

Racial slurs like those at issue in *Talley* and *Miles* and sexist denigration like that at issue here and in *Hurley* are profoundly offensive to most of us. But a supervisor's use of such language is admissible in an employment discrimination action not because the language is so offensive but because of what it may suggest to the factfinder about the defendant's employment decisions. As we explained in *Mullen:*

> The use of racially offensive language by the decision maker is relevant as to whether racial animus was behind [his decision] ... and was proper evidence for the jury to consider.... Use of racial aspersions obviously provides an indication that the speaker might be more likely to take race into account in making a hiring ... decision.

853 F.2d at 1133. Sexually offensive language is no different. *See e.g. Kolstad v. American Dental Ass'n,* —— U.S. ——, 119 S.Ct. 2118, 2121, 144 L.Ed.2d 494 (1999) (finding admissible testimony regarding supervisor's sexually offensive jokes at staff meetings and references to several women as "bitches" and "battleaxes" as evidence of his bias in sex discrimination case).

Finally, contrary to VUU's suggestion, the demeaning, lewd remark assertedly made by Chief Wells is not "like" the age-related comments we have previously considered. No great mental gymnastics are necessary to understand that supervisors' statements that an employer needs to "attract newer, younger people" and "young blood," *see EEOC v. Clay Printing Co.,* 955 F.2d 936, 942 (4th Cir.1992), or that "there comes a time when we have to make way for younger people," *see Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 511–12 (4th Cir.1994), are simply not the same .as remarking on a woman's "good pussy." Indeed, as Chief Judge Wilkinson explained in *Birkbeck* itself, "statements about age may well not carry the same animus as those about race or gender," because "[u]nlike race or gender differences, age does not create a true we/they situation—barring unfortunate events, every one will enter the protected age group at some point in their lives." *Id.* at 512. The remark at issue here differs not just in degree but also in kind from those complained of in our age discrimination cases.

Perhaps appellants' counsel best explained the fundamental distinction:

It wouldn't surprise any of us if one of us went out, slapped somebody on the back and said you're too damn old to play this game of golf anymore. We're all aging. One thing that would shock us is if anybody on the bench or any one in this courtroom turned around and said about a woman, I think she's got good pussy. You don't kid around like that. I mean, we know that. And this

stray, isolated comment of you're too damn old for this job is a decision by the Fourth Circuit that fits with human experience. Saying about a woman, I think that she's got good pussy is not a joke, it's something that says that you're treating this person as a sex object, you're not treating her as an equal in the work force. It's not a stray comment, or isolated comment, it goes directly to the issue of how you perceive women in the work force .... it's a big, wide viewfinder into the soul of the individual who is making it, and it demonstrates that he has a tremendous animus towards women.

I agree and am deeply disappointed that a respected institution of higher learning would suggest otherwise.