# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SARAH M. WAGNER,
　　　　　　　*Plaintiff-Appellee,*

v.

DILLARD DEPARTMENT STORES,
INCORPORATED, d/b/a Dillard's,
　　　　　　　*Defendant-Appellant.*

No. 00-2109

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-98-499-1)

Argued: April 5, 2001

Decided: August 27, 2001

Before WILLIAMS, MICHAEL, and TRAXLER, Circuit Judges.

---

Affirmed in part, reversed in part, vacated in part, and remanded by
unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Gregory Phillip McGuire, HAYNSWORTH, BALDWIN,
JOHNSON & GREAVES, L.L.C., Raleigh, North Carolina, for
Appellant. Rebecca Perry, PURYEAR & LINGLE, P.L.L.C., Greens-
boro, North Carolina, for Appellee. **ON BRIEF:** Sarah H. Roane,
HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, L.L.C.,
Raleigh, North Carolina, for Appellant. David B. Puryear, R. J.

Lingle, PURYEAR & LINGLE, P.L.L.C., Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Sarah M. Wagner brought an action against Dillard Department Stores, Inc. ("Dillard's") contending that Dillard's refused to hire Wagner because she was pregnant and, therefore, engaged in gender discrimination in violation of Title VII. *See* 42 U.S.C.A. §§ 2000e(k), 2000e-2(a)(1) (West 1994). A jury awarded Wagner $41,720 in back pay as well as punitive damages. Dillard's appeals the district court's denial of its motion for judgment as a matter of law or, in the alternative, for a new trial on damages. We affirm the district court's denial of judgment as a matter of law, but we vacate the jury's award of back pay and remand for further proceedings.

### I.

Wagner applied for a job in sales or as a clerical assistant at the Dillard's department store in the Four Seasons Mall in Greensboro, North Carolina. Wagner was six months pregnant at the time and was obviously expecting a child. She submitted an employment application to Stacy Simmerman, the Area Sales Manager for the lingerie and children's clothing departments, although Wagner was not interested in any particular department. She was seeking any available sales or clerical position. Wagner and Simmerman briefly discussed Wagner's prior sales experience, and Simmerman indicated that she would contact Wagner after Wagner's references had been checked. Wagner eventually returned for an interview with Simmerman.

During the interview, Simmerman reviewed Wagner's employment history and discussed employment benefits offered by Dillard's and

the possibility of Wagner working in the children's department. According to Wagner, Simmerman offered her a position, but later withdrew the offer after meeting with a supervisor and explaining to Wagner that the Family Medical Leave Act ("FMLA") would not afford Wagner the leave time necessary for her to deliver the baby. Wagner's testimony on this point is the evidentiary crux of the case:

QUESTION:   Did [Simmerman] actually offer you a job?

MS. WAGNER:   Yes. She told me she was willing to offer me a job for $8.00 a[n] hour to start that day.

. . .

QUESTION:   You said that you-all talked about your pregnancy and she asked you how far along you were. Did you talk any further about your pregnancy?

MS. WAGNER:   . . . [W]hen we went over to discuss the papers, I asked her about arranging my schedule because I would have to go to doctor's appointments later in my pregnancy once a week.

QUESTION:   . . . What papers were those that you are referring to?

MS. WAGNER:   There were — she flipped through the stack just briefly, W-2 or W-4 forms . . . .

. . .

MS. WAGNER:   Insurance papers.

QUESTION:   For you to fill out?

MS. WAGNER:   Yes.

QUESTION:   Was that after she had offered the job or before?

MS. WAGNER:   After.

QUESTION:   Now you said that after the job was offered she was flipping through these papers, you-all discussed your pregnancy a little bit further.

. . .

MS. WAGNER:   That's when I asked her about having to go to the doctor once a week later in my pregnancy, I would need to be scheduled around that or be able to go.

QUESTION:   Did you also ask her about the possibility of you returning to a sales position after you had the baby?

MS. WAGNER:   Yes. I told her I wanted to come back to work immediately after I had the baby.

QUESTION:   Do you remember talking with her about the Family Medical Leave Act?

MS. WAGNER:   No. I didn't — nothing was discussed about the Family Medical Leave Act until we were out of the room.

QUESTION:   Okay. Well, what happened after you were out of the room? What conversation regarding the Family Medical Leave Act did you-all have?

MS. WAGNER:   She said it prevented her from hiring me because I wouldn't be able to take time off to have the baby.

QUESTION:   Had she left the room prior to that conversation?

MS. WAGNER:   Yes.

QUESTION:   Tell me about that. What prompted her to leave the room?

MS. WAGNER:   She said that her supervisor liked to meet everyone that she hired and she went to get him.

QUESTION:   Did he come back with her?

MS. WAGNER:   No.

QUESTION:   Did she come back with a copy of the Family Medical Leave Act?

MS. WAGNER:   Yes.

QUESTION:   And then did she explain to you that the Family Medical Leave Act prevented her from hiring you?

MS. WAGNER:   Yes.

QUESTION:   What was your response when she told you that?

MS. WAGNER:   I said, why? And she said, Because you wouldn't be able to take time off to have the baby. And I said, Okay.

QUESTION:   At that time, did you believe that she was being — that she was violating any law by refusing to hire you because you couldn't take time off to have the baby?

MS. WAGNER:   I didn't know.

QUESTION:   You didn't know. Okay. Did she say anything else to you after that?

MS. WAGNER:   She told me to come back after the baby was born and I had proper childcare.

J.A. 179-182. Immediately following the interview, Wagner explained to her mother, who had accompanied Wagner to the store, that she did not get the job because she was pregnant.

Dillard's stance at trial and on appeal is that Wagner was not hired because (1) at the time of Wagner's interview a budgetary hiring freeze was in effect for the two departments overseen by Simmerman and (2) a company-wide hiring freeze went into effect shortly after Wagner's interview. Simmerman denied ever offering Wagner a job or telling her that Dillard's could not hire her as a result of her need for time off to deliver the baby. When asked if she would have hired Wagner but for the hiring freeze, Simmerman responded in the affirmative.

There was, however, evidence presented that could reasonably have caused the jury to be skeptical of Dillard's argument that Wagner was not hired only because no positions were available. First, Wagner testified — and Simmerman did not disagree — that nothing was said during the interview about a hiring freeze at Dillard's in general or a lack of openings in Simmerman's departments in particular. Secondly, the evidence showed the company-wide hiring freeze did not go into effect until some time after Wagner's interview. The jury learned that Dillard's hired 22 sales associates, none of whom were pregnant, between the date that Wagner applied and the date that the company-wide hiring freeze began, and twelve of these employees were hired *after* Wagner's interview. Although none of these positions were in the children's or lingerie departments, which were under Simmerman's charge, Wagner's application was not limited to these departments. Simmerman acknowledged that as an area sales manager, she interviewed applicants for positions in all departments. Finally, Simmerman and Dillard's operations manager Robert Kayda were adamant that area sales managers at Dillard's did not have the authority to hire applicants. Unfortunately for Dillard's, Wagner produced a rebuttal witness who testified to the contrary — that she was hired by an area sales manager and that she never spoke with Kayda or Jeff Breeson, the store manager, as Dillard's claimed any applicant was required to do before being hired. And, according to Wagner's testimony, Simmerman herself suggested she had such authority when she told Wagner that "her supervisor liked to meet everyone that she hired." J.A. 181.

The case was submitted to the jury on the issue of liability. The district court instructed the jury that "Wagner must prove by the greater weight of the evidence, that [Dillard's] actions in not hiring her were

more likely than not motivated, at least in part, by her pregnancy" and that Wagner "need only prove that her pregnancy played a part in the defendant's decision, even though other factors may also have motivated the defendant." J.A. 299. The jury returned a verdict in favor of Wagner.

During the damages phase of the trial, Wagner testified that the position she sought with Dillard's paid $8.00 per hour. After she unsuccessfully applied for a job at Dillard's, Wagner continued looking for employment. She identified some twenty-three prospective employers to whom she applied. Wagner indicated that in March 1997, she stopped looking for employment because she had been unsuccessful in finding a job that would pay enough to cover day care expenses and other expenses arising as a result of employment. Wagner eventually obtained employment in December 1998 and was steadily employed until the trial. The jury returned a verdict of $41,720 in total compensatory damages. The jury also returned an award of punitive damages that Dillard's does not challenge on appeal. Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, Dillard's moved for judgment as a matter of law or, alternatively, for a new trial with respect to back pay. The district court denied this motion, and Dillard's appeals.

II.

Dillard's contends that the district court erroneously concluded Wagner presented direct evidence of unlawful discrimination. As a result of that decision, the district court channeled the case into the "mixed-motive" mode of analysis, which, Dillard's claims, was not appropriate in this case.[1] Dillard's also makes the related argument that because Wagner lacked direct evidence of discrimination, she needed to present evidence that Dillard's gave more favorable treatment to nonpregnant applicants who were similarly situated. Since

---

[1]According to Dillard's, the problem was compounded by the fact that the parties tried the case as if it were a "pretext" case, as evidenced by the fact that Dillard's and Wagner both submitted pretext jury charges. Dillard's claims that it was not until the district court ruled on its post-trial motion that Dillard's became aware that the district court considered mixed-motive treatment appropriate.

Wagner did not adduce any such evidence, Dillard's claims there was no evidentiary support for a verdict of intentional pregnancy discrimination, and, as a result, the district court erred in denying Dillard's motion for judgment as a matter of law under Rule 50(b). Because these arguments overlap substantially, we will address them together.

Under Rule 50(b), the district court should grant a motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on that issue.'" *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (internal quotation marks and brackets omitted). Our review is *de novo*. "If, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in [Wagner's] favor, we are constrained to affirm the jury verdict." *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001). Because there has been a full trial on the merits, "our sole focus is 'discrimination *vel non*'—that is, whether in light of the applicable standard of review the jury's finding of unlawful [discrimination] is supportable." *Cline v. Wal-Mart Stores*, 144 F.3d 294, 301 (4th Cir. 1998). Judgment as a matter of law is only appropriate if, viewing the evidence in the light most favorable to the non-moving party, the court concludes that "a reasonable trier of fact could draw only one conclusion from the evidence." *Brown v. CSX Transp., Inc.*, 18 F.3d 245, 248 (4th Cir. 1994) (internal quotation marks omitted).

A.

Under Title VII, it is unlawful "to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). The statute provides that "[t]he terms 'because of sex' and 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C.A. § 2000e(k). We analyze a pregnancy discrimination claim "in the same manner as any other sex discrimination claim brought pursuant to Title VII." *DeJarnette*, 133 F.3d at 297 (internal quotation marks omitted).

A Title VII plaintiff "utilize[s] ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598,

607 (4th Cir. 1999) (internal quotation marks omitted). A Title VII plaintiff who presents sufficiently direct evidence qualifies for the "mixed-motive" standard of liability. *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc), *cert. denied*, 528 U.S. 1189 (2000); *Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir. 1995). In a mixed-motive case, a plaintiff must prove that the illegitimate factor — pregnancy, in this case — was "a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e-2(m) (West 1994); *see Fuller*, 67 F.3d at 1142; *see also Watson v. Southeastern Pa. Trans. Auth. ("SEPTA")*, 207 F.3d 207, 215-20 (3d Cir. 2000), *cert. denied*, 121 S. Ct. 1086 (2001). Thus, in a mixed-motive case, "employers . . . violate the Act when [the illegitimate factor] plays an actual role in an employment decision, regardless of other considerations that may independently explain the outcome." *Fuller*, 67 F.3d at 1142. Employers are afforded an affirmative defense in mixed-motive cases whereby remedies can be limited if the employer demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C.A. § 2000e-5(g)(2)(B) (West 1994); *see Fuller*, 67 F.3d at 1142 & n.1.

If the plaintiff's evidence is not sufficiently direct, then a mixed-motive instruction is inappropriate and the plaintiff must proceed under the "pretext" method of proof. *See Fuller*, 67 F.3d at 1144 ("[O]nly those plaintiffs who satisfy the evidentiary burden entitling them to mixed-motive treatment can qualify for an instruction under [§ 2000e-2(m)]."). In such cases, the employee must prove that "the employee's protected trait actually played a role in [the decisionmaking] process and had *a determinative influence* on the outcome." *Id.* at 1144 (internal quotation marks omitted). The "determinative factor" requirement is essentially a "but for" causation requirement. *See id.* Thus, determining the category to which a given claim belongs is critical because the standard of liability hinges on this determination.

Whether the court issues a mixed-motive instruction or a pretext instruction is strictly a question of "the *strength of the evidence* establishing discrimination," *id.* at 1143 (emphasis added), rather than a question of which theory best describes the case. In order to merit the more favorable mixed-motive jury instruction, a plaintiff must present "'direct evidence that decisionmakers placed substantial negative reli-

ance on an illegitimate criterion.'" *Id.* at 1142 (quoting *Price Water-house v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)). Direct evidence in this context "describes a relationship between proof and incidents and [is] not a characterization of the proof itself." *Thomas v. National Football League Players Ass'n*, 131 F.3d 198, 204 (D.C. Cir. 1997). We have previously established that a plaintiff is entitled to a mixed-motive instruction if the plaintiff presents "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller*, 67 F.3d at 1142. Direct evidence is "the sort of evidence of discrimination that in itself entitles [a plaintiff] to take [her] case to a jury without disproving [the defendant's] stated rationale for firing [her]." *Indurante v. Local 705, Int'l Bhd. of Teamsters, AFL-CIO,* 160 F.3d 364, 366 (7th Cir. 1998); *see also Maldonado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir. 1999) (explaining that direct evidence is "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant" (internal quotation marks omitted)). It is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Health-care Prods.*, 176 F.3d 921, 926 (6th Cir. 1999).

B.

While there was both direct and indirect evidence of discrimination, the district court concluded that Wagner's testimony supplied sufficiently direct evidence of discrimination to justify mixed-motive treatment of her claim. The district court charged the jury, based on this conclusion, that "[Wagner] need only prove that her pregnancy played a part in [Dillard's] decision, even though other factors may also have motivated the defendant," *i.e.*, that her pregnancy was a "motivating factor" in Dillard's decision. J.A. 299.

As noted previously, Dillard's defended this case at trial on the sole theory that Wagner was not hired because of hiring freezes which were in effect at the time of her interview. However, on appeal, Dillard's argues that, even if one accepts Wagner's testimony as true, Wagner failed to present direct evidence of pregnancy discrimination because, the argument goes, Wagner's testimony shows only that Wagner was not hired because of her inability to work and her need

to take leave shortly after being hired. According to Dillard's, this is an employment consideration which is *not* prohibited by the Pregnancy Discrimination Act. It is perfectly permissible, Dillard's asserts, to dismiss an employee for absences or tardiness, even if they are directly the result of the employee's pregnancy, *see, e.g., Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994), as long as the employer does not overlook similar absences or tardiness from nonpregnant employees.

The Pregnancy Discrimination Act "address[es] the stereotype that women are less desirable employees because they are liable to become pregnant" and "insure[s] that the decision whether to work while pregnant [is] reserved for each individual woman to make for herself." *Maldonado*, 186 F.3d at 762 (internal quotation marks omitted). Thus, an employer cannot take adverse action against a pregnant employee "because it anticipated that she would be unable to fulfill its job expectations." *Id.* at 768 (internal quotation marks omitted); *see id.* at 766-68 (reversing grant of summary judgment to employer where employer "simply assumed that, because of her pregnancy, [plaintiff] would be absent from work for an indeterminate period sometime in the future"); *see also Troy v. Bay State Computer Group, Inc.*, 141 F.3d 378, 380-82 (1st Cir. 1998) (affirming jury verdict in favor of plaintiff when it was reasonable for the jury to conclude that she had been dismissed based on the "stereotypical judgment that pregnant women are poor attendees"); *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 434 (8th Cir. 1998) (affirming jury's verdict that plaintiff was subjected to pregnancy discrimination when, despite her doctor's approval to return to work, she was placed on medical leave by her supervisors who were "acting on the assumption that she had a pregnancy-related complication that would not allow her to perform her job functions").

Although a number of considerations would undoubtedly come into play in evaluating Dillard's argument that it is permissible to dismiss an employee for absences or tardiness caused by or related to pregnancy or childbirth, we are simply not presented with this factual scenario today. Dillard's did not dismiss Wagner from employment because she failed to work or show up timely for her shifts, nor did Dillard's decline to hire Wagner because she planned to take maternity leave shortly after beginning her employment. Dillard's position

at trial was that it did not hire Wagner because of a hiring freeze, a factual assertion that the jury obviously rejected.

But, even if we now engage in the fiction that Dillard's chose not to hire Wagner because Wagner would be absent from work, Dillard's cannot prevail. At best, Dillard's argument amounts to a post hoc fictitious assertion that it did not hire Wagner based upon the *assumption* that she could not or would not come to work either because of her pregnancy or in the wake of her anticipated childbirth. Given Dillard's stance at trial, of course, the evidence, when read in the light most favorable to Wagner, does not support such a stereotypical assumption on Dillard's part. And, we are certainly unprepared to take judicial notice of the physical abilities or limitations of women who bear children, other than to note that they would surely vary widely from individual to individual. Also, Wagner's testimony on this precise issue reflects an undisputed intent on her part to work up until delivery and to *not* take maternity leave.[2] She expressed an intention to return to work immediately after delivering her baby. The jury, of course, could reasonably infer from the evidence, viewed in the light most favorable to Wagner, that Dillard's simply assumed that Wagner's delivery would require her to take leave and miss work and, therefore, did not hire Wagner for this reason.

Accordingly, we conclude that the district court did not err in determining that Wagner presented direct evidence of discrimination on the basis of pregnancy. Simmerman's refusal to hire Wagner obviously "bear[s] directly on the contested employment decision." *Fuller*, 67 F.3d at 1142. Because the evidence supports the conclusion that

---

[2]Although Wagner testified that she would need to schedule weekly doctor's meetings later in her pregnancy, this testimony could be interpreted to mean that she would need to have shifts scheduled in a manner so as to accomodate doctor's appointments. Under this interpretation, Wagner's pregnancy would not render her unable to work her normal shifts. Of course, her testimony also could be interpreted to mean that she would be unable to accomodate Dillard's normal scheduling, thus requiring a substantial amount of leave time, but at this stage, we interpret the testimony in the light most favorable to Wagner; thus, we conclude that her testimony does not suggest the need for substantial absences from work shortly after being hired.

Simmerman declined to hire Wagner based on her assumption that Wagner would need leave because she was pregnant, it "reflect[s] directly the alleged discriminatory attitude." *Id.* The district court properly issued a mixed-motive instruction to the jury.

## C.

With respect to Dillard's claim that the district court was obliged to grant its motion for judgment as a matter of law, we must determine if, viewing the facts in the light most favorable to Wagner, there was sufficient evidence for a reasonable jury to have found that Wagner's pregnancy was a motivating factor in Dillard's failure to hire her. *See Lack*, 240 F.3d at 259. We believe there was sufficient evidence.

Dillard's contends that Wagner failed to establish her claim because she did not present comparative evidence of similarly situated nonpregnant applicants who were treated more favorably. Given our conclusion that Wagner submitted direct evidence of pregnancy discrimination, we reject this argument. Wagner's testimony is sufficient without such evidence to support a finding that Wagner's pregnancy was a motivating factor in Dillard's failure to hire her. *See Jacklyn*, 176 F.3d at 926 (describing direct evidence as "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions").

Moreover, if we give Wagner the benefit of the doubt in reviewing the evidence, we cannot say that a reasonable jury could not have found that Dillard's discriminated against Wagner on the basis of her pregnancy. After knowing Wagner was pregnant, after knowing that Wagner was desirous of arranging her work schedule so she could attend her doctors' appointments, and after telling Wagner she was hired, Simmerman left to get her supervisor, Robert Kayda, so he could meet Dillard's newest employee. When Simmerman returned, Wagner was told she would *not* be hired, that it was because the FMLA would not allow Wagner to take any time off to have the baby, and that Wagner should return "after the baby was born and [she] had proper childcare." Wagner, of course, had no way of knowing what conversation occurred between Simmerman and Robert Kayda, and so she, like the jury, had only Simmerman's subsequent statement to

her to discern what had gone on between Simmerman and Kayda and what had caused this sudden change in attitude.

But, knowing that Simmerman went to get Robert Kayda to meet Wagner whom she had hired in the face of Wagner's pregnancy and knowing that after talking to him Simmerman refused to let Wagner have the job, Wagner and the jury could reasonably infer that the change was due to an assumption by Kayda (despite his denial) that Wagner intended and needed to take pregnancy-related leave. Indeed, according to Wagner, she was specifically told that Dillard's could not hire her because she would not be able to take any time off to have the baby under the FMLA and that she should "come back after the baby was born and [she] had proper childcare." J.A. 182.

These statements reflect the stereotypical assumption that pregnant women will eventually require substantial absences from work. They show, even in the face of a contrary statement by Wagner herself, a belief that Wagner would not come back to work immediately after the birth of her child. In short, under this interpretation of the evidence, Dillard's refused to hire Wagner for the very reasons that the Pregnancy Discrimination Act was designed to eradicate.

Accordingly, we affirm the district court's denial of Dillard's motion for judgment as a matter of law.

### III.

Dillard's argues that even if a mixed-motive instruction was proper, the district court's jury charge was incomplete because it failed to instruct the jury to determine whether Dillard's proved that it "would have taken the same action in the absence of the impermissible motivating factor," 42 U.S.C.A. § 2000e-5(g)(2)(B), a finding that would limit Wagner's remedies against Dillard's, but would not permit Dillard's to avoid liability altogether. Because Dillard's failed to request any such instruction, our review of the district court's instruction is for plain error. *See Rice v. Community Health Ass'n*, 203 F.3d 283, 286 (4th Cir. 2000). And, even if the district court committed a plain error in not issuing *sua sponte* Dillard's desired instruction, we will notice the error "only if exceptional circumstances exist such as when the error is so obvious or serious that the public reputa-

tion and integrity of the judicial proceeding is impaired." *Hafner v. Brown*, 983 F.2d 570, 578 (4th Cir. 1992) (internal quotation marks omitted).

Dillard's argues that it did not waive its objection to the omission of this instruction because the district court did not inform Dillard's until after trial that the court considered the case to involve direct evidence and thus fall within the ambit of the mixed-motive framework. We disagree. In the district court's preliminary instructions to the jury prior to opening statements, the court explained the nature of Wagner's claim and her burden of proof in almost precisely the same language that the court used in its instructions prior to jury deliberation. The district court informed the jury that Wagner "need prove only that her pregnancy played a part in the defendant's decision as a motivating factor, even though other factors may have also motivated the defendant's decision not to employ her." J.A. 159. These preliminary instructions provided Dillard's with an early clue to the district court's view of the appropriate analysis. The court incorporated this language into its proposed jury instructions, which it read to counsel outside the presence of the jury. The use of this language should have informed the parties that the district court believed that a mixed-motive instruction was appropriate, as counsel for Dillard's forthrightly conceded at oral argument. Although it would have helped focus the issues and the arguments of the parties if the district court had expressly informed the parties of its theoretical view of the case, the court is under no duty to do so and the court's proposed instructions will usually afford the litigants sufficient notice to enable them to react. *Cf. Fuller*, 67 F.3d at 1142 n.2 ("[A] plaintiff need not decide at the outset whether to classify his case as a 'pretext' or a 'mixed-motive' case. Instead, the district judge makes this determination after evaluating the evidence, and instructs the jury accordingly.").

We conclude that the district court's instruction did not constitute plain error. In fact, it is doubtful the district court erred at all in this particular instruction, let alone plainly so. In section 2000e-5(g)(2)(B), Congress modified the full affirmative defense to liability available to employers under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989) (plurality opinion), when the employer demonstrated that it would have reached the same decision absent any discrimination. *See Taylor*, 193 F.3d at 232. Now, the same showing will not

permit an employer to escape liability in a mixed-motive case; it can only limit the remedies available against it. *See* 42 U.S.C.A. § 2000e-5(g)(2)(B). Nevertheless, it is still an affirmative defense to a charge of intentional discrimination. Affirmative defenses, of course, are generally subject to waiver. *See Brinkley*, 180 F.3d at 612. We can find nothing in the statute that requires, as a matter of law, a district court to instruct the jury on an employer's affirmative defense under section 2000e-5(g)(2)(B), *see Fields v. New York State Office of Mental Retardation and Devel. Disabilities*, 115 F.3d 116, 123-24 (2d Cir. 1997), nor do we perceive any threat to the "public reputation and integrity of the judicial proceeding," *Hafner*, 983 F.2d at 578 (internal quotation marks omitted).

IV.

Dillard's argues that the district court erred in denying its Rule 59 motion for a new trial or, alternatively, for a reduction of the jury's award of $41,720 in back pay. The jury's verdict covered two separate time periods. First, the jury awarded $5,120 in back pay from November 16, 1996, the date Wagner applied to Dillard's, to March 15, 1997, the date on which Wagner admittedly ceased actively looking for work. Dillard's does not challenge this portion of the award. Second, the jury awarded $36,000 in back pay for the period from March 15, 1997 to October 14, 1999, the date of trial. In December 1998, Wagner began working again on a part-time basis. Dillard's argues that between March 15, 1997 and December 1998, Wagner did not work or make a reasonable effort to obtain employment and thus is not entitled to back pay for all of the latter period. On an excessiveness challenge to the jury's verdict under Rule 59, the district court may set aside an award of compensatory damages if "the jury's verdict is against the weight of the evidence or based on evidence which is false." *Cline*, 144 F.3d at 305 (internal quotation marks omitted). We review a district court's denial of a Rule 59 motion for abuse of discretion. *See id.* at 301.

The victim of an unlawful employment practice under Title VII may be entitled to back pay; however, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C.A. § 2000e-5(g)(1). Thus, a successful Title VII

claimant has "a statutory duty to mitigate employer damages." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985). This duty requires the plaintiff to "make a reasonable effort to find other suitable employment." *Id.* A plaintiff who remains idle instead of seeking employment forfeits his right to back pay for the period during which plaintiff did not seek employment. *See id.*; *Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001). A failure to mitigate claim is an affirmative defense for which the employer bears the burden of proof. *See Miller*, 250 F.3d at 838.

Dillard's does not dispute that Wagner made a reasonable effort to obtain employment before March 15, 1997. Dillard's argues that Wagner's own testimony established that she made no effort to secure employment between March 15, 1997 and December 1998, a period of nearly two years. Dillard's contends that the jury's award of $36,000 in back pay for the period from March 15, 1997 to October 14, 1999 was excessive in light of the undisputed amount of time that Wagner neither worked nor sought employment.

Wagner testified that in February 1997, after having been unable to obtain work with Dillard's or any other Greensboro area employer with whom she applied, she was forced to move to Oxford with her parents who were supporting her. In Oxford and the surrounding area, Wagner submitted applications to numerous employers but she did not receive any job offers. Wagner indicated that one month later, however, she discontinued her search for employment because she had failed to find a job in Oxford that would provide her with enough income to do much more than cover day care costs and other expenses necessitated by employment. Wagner submitted her last application on March 15, 1997.

Wagner contends that Dillard's failed to carry its burden of proving the failure to mitigate damages because Dillard's relies solely on Wagner's own testimony to support its claim. Wagner argues that Dillard's was required to come forward with evidence that suitable work was, in fact, available in Oxford or the surrounding area. In Wagner's view, the jury could have concluded, based on her testimony, that she exhausted the potential suitable employment in Oxford and therefore made reasonable efforts to mitigate her damages. Because Dillard's did not refute this with evidence that appropriate work was, in fact,

available, Wagner argues that Dillard's failed to carry its burden of proof.

Although an employer ordinarily must come forward with evidence that comparable work is available, that is not the case if the plaintiff makes little or no effort to seek employment. *See E.E.O.C. v. Service News Co.*, 898 F.2d 958, 963 (4th Cir. 1990) (reversing district court award of back pay for a five-month period based solely on plaintiff's testimony that "her only efforts during this period were looking through want ads"). As we explained in *Brady*, "a Title VII claimant's voluntary refusal to seek or accept substantially equivalent employment . . . risks or even insures a loss of back pay." *Brady*, 753 F.2d at 1273. Thus, we reject Wagner's argument that, to establish a Title VII plaintiff's failure to mitigate, an employer must always present evidence of available, suitable employment, even when the employer has demonstrated that the plaintiff made no reasonable attempt to find work. *See also Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998) ("An employer . . . is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment."); *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1139 (5th Cir. 1988) (same).

With respect to the period of March, 15, 1997 to December 1998, the only evidence in the record, Wagner's testimony, establishes that Wagner made no attempt to find employment. After one month of searching for work in Oxford and the surrounding area that included Raleigh and Durham, Wagner went well over one and one-half years without attempting to find work. We conclude that voluntarily remaining idle for that amount of time simply cannot translate into a reasonable effort to obtain comparable employment. The jury's award of back pay for the period of March 15, 1997 to October 12, 1999, clearly compensated Wagner for most of the time that she was not seeking work. Thus, we are constrained to conclude that the $36,000 award of back pay was against the weight of the evidence. That is not to say, however, that Wagner is not entitled to any back pay for the period of March 15, 1997 to October 12, 1999. She obviously searched for and actually obtained gainful employment during this period. We believe the wisest course is to remand for a new trial on

the narrow issue of back pay for the period of March 15, 1997 to October 12, 1999.

## V.

For the foregoing reasons, we affirm the district court's denial of Dillard's motion for judgment as a matter of law. However, we reverse the district court's denial of Dillard's motion for a new trial on damages or, alternatively, a reduction of the jury's award of back pay. We vacate the jury's verdict to the extent that it awarded $36,000 for the period of March 15, 1997 to October 12, 1999. The case is remanded for a new trial on the narrow issue of back pay for the period of March 15, 1997 to October 12, 1999.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*