UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellant,*

v.

JAMES E. HOWARD, JR.; DOWN EAST
FARMS, INCORPORATED,
　　　　　*Defendants-Appellees.*

No. 01-2266

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Malcolm J. Howard, District Judge.
(CA-99-192-4-H(3))

Argued: September 23, 2002

Decided: November 18, 2002

Before LUTTIG and WILLIAMS, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion. Senior Judge Hamilton
wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Neal Irving Fowler, Assistant United States Attorney,
Civil Division, Raleigh, North Carolina, for Appellant. George Mason
Oliver, STUBBS & PURDUE, P.A., New Bern, North Carolina, for
Appellees. **ON BRIEF:** John Stuart Bruce, United States Attorney,
Anne M. Hayes, Assistant United States Attorney, Civil Division,

Raleigh, North Carolina, for Appellant. Trawick H. Stubbs, Jr., STUBBS & PURDUE, P.A., New Bern, North Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

Appellant, the United States, appeals from the judgment of the district court, contending that the court erred in several of its evidentiary rulings made below in the course of a bench trial. The United States requests a new trial. As we determine that the district court either did not err or committed harmless error in its rulings, we affirm.

I.

James Howard and his corporation Down East Farms, Inc. (the "defendants") farmed approximately 2,400 acres of land during the 1992 crop year. In September and October of 1992, Howard sold approximately 45,000 bushels of corn owned by Down East Farms under a fictitious name. Also in 1992, the defendants signed or caused to be signed various documents in connection with filing for and obtaining crop insurance indemnity payments and disaster relief payments from several federal agencies and programs, including the Risk Management Agency and the Farm Service Agency's Disaster Assistance Program. The defendants received $85,893 for crop losses from these programs. The defendants did not report the 45,000 bushels of corn they sold in 1992 on the documents filed with the federal agencies. If the bushels were from the 1992 harvest, then evidently the defendants would not have been entitled to the insurance and disaster relief payments received for crop losses in 1992.

The United States sued the defendants under several legal theories, including violation of the False Claims Act, common law fraud,

unjust enrichment, and payment under mistake of fact. All of these claims turned on the allegation that the defendants gave false information on the forms submitted to the federal agencies in order to defraud the United States. This allegation in turn depended on the United States' contention that the 45,000 bushels sold under a false name were part of the 1992 harvest.

The basis for the United States' contention that the corn was harvested in 1992 was as follows (according to the testimony of the expert witnesses presented by the United States, or admitted by the defendants). Corn can be stored safely for long periods of time only at or below a moisture level of 15.5-16%. Corn stored at a higher moisture level runs the risk of disease, mold, or rot. When sold, the moisture level of corn is measured by machine. The type of machine used to measure the disputed bushels' moisture was known as a Dickey John. When samples of the disputed 45,000 bushels of corn were measured by a Dickey John, the readings returned by the machine placed the moisture level of the corn between 15.5% and 17.8%. The buyer of the disputed corn reduced the price paid for drying charges, but not for poor quality, as one would presumably expect if the corn were stored for a long period of time above a 15.5-16% moisture level. Hence, the United States argued, this evidence, although circumstantial, established that the disputed 45,000 bushels sold by the defendants in 1992 were harvested in 1992.

The defendants claimed that the 45,000 bushels sold in 1992 were from the defendants' stored corn, harvested in 1991 or earlier. Therefore, they argued, they did not give false information on the various documents relating to crop losses in 1992. To explain the high moisture level of the corn, the defendants claimed that they had sprayed water on the corn either during storage or during the transfer of the corn from the storage bins into the trucks used to ship the corn.

To support this explanation, at trial the defendants called a witness by the name of Harold Smith, an operator of a Dickey John, and the individual who purchased the disputed bushels of grain from the defendants. After an objection from the United States (overruled by the district court), Mr. Smith testified and then performed an in-court experiment on the Dickey John machine. He took a small sample of corn and measured it in the Dickey John machine. The machine

returned a reading of 13.8% moisture. Then, Mr. Smith sprayed a small amount of water on the corn, and ran it through the machine. After approximately 15 minutes (during which time Mr. Smith was vigorously cross-examined by counsel for the United States as to his observations and his expertise in the Dickey John and in corn), the machine returned a reading of 19.5% moisture.

At the close of the trial, defendants moved for a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). The district court, relying in part on the result of the in-court experiment in its factual findings, granted the defendants' motion and entered a judgment against the United States on all of its claims.

The United States now appeals, challenging the admission of opinion testimony from Mr. Smith, as well as the admission of the in-court experiment.

## II.

The United States argues that the district court erred in allowing the in-court experiment into evidence. Although it is not clear as to which of the Federal Rules of Evidence the United States contends was violated, two seem possible: Fed. R. Evid. 402 (stating that evidence "which is not relevant is not admissible") and Fed. R. Evid. 403 (stating that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .").

First, we conclude that the in-court experiment was relevant. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The fact that the spraying of water on the exterior of a sample of corn could raise the moisture reading of the corn sample on the Dickey John does make the defendants' explanation for the high moisture readings of the disputed bushels at least slightly more probable. Hence, the admission of this evidence did not violate Fed. R. Evid. 402 ("All relevant evidence is admissible, except as otherwise provided . . . .").

Second, the United States' objection fares no better under Fed. R. Evid. 403. "[I]n the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial." *Schultz* v. *Butcher*, 24 F.3d 626, 632 (4th Cir. 1994). As the instant case involved a bench trial, rather than a jury trial, Fed. R. Evid. 403 was not violated by the admission of the in-court experiment.

The United States also raises numerous objections to aspects of Mr. Smith's testimony, characterizing portions of the testimony as opinion testimony, admitted in violation of Fed. R. Evid. 701 and 702. But, the only factual findings in the district court's order relating to Mr. Smith's testimony are the following: "13. The court finds, through the testimony of grain buyer Harold Smith and his demonstration with the actual Dickey John used to measure the moisture content of the disputed 45,000 bushels of corn, that it is possible to spray water onto corn and thereby raise the moisture content measurement on the Dickey John. 14. The aforementioned demonstration in the court showed that spraying water on corn with an initial content of 13.8 could raise the moisture level of the corn to approximately 19.5, an increase of 5.7." J.A. 553. These factual findings are seemingly based entirely on the result of the in-court experiment, which we have determined to be admissible. The district court does not rely elsewhere on any of the objected-to opinion testimony in its order.* Hence, to the extent that the district court entered opinion testimony in violation of Fed. R. Evid. 701 and 702, these errors were harmless. *See Taylor* v. *Virginia Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999).

The judgment of the district court is affirmed.

---

*In its order, the district court did reference one piece of opinion testimony by Mr. Smith. J.A. 550. But, the opinion testimony was mentioned in a section labeled "Preamble." This section appeared to be simply a short description of what occurred during the trial, rather than a discussion of the district court's reasoning. Also, the opinion testimony mentioned by the district court was given in response to direct questions from opposing counsel on cross-examination, and thus any error was invited by the United States' counsel and its admission cannot be challenged by the United States on appeal. *See United States* v. *Neal*, 78 F.3d 901, 904 (4th Cir. 1996).

*AFFIRMED*

HAMILTON, Senior Circuit Judge, dissenting:

The government brought this case under the theory that the 45,000 bushels of corn, contained in sixty-eight truckloads, were harvested in 1992 and not, as the defendants claimed, in 1991 or earlier. The government's case centered around proving that the high moisture reading patterns as reflected on the grain tickets could not be achieved in the manner for adding moisture described by the defendants (rehydrating the corn in storage and/or with a garden hose while being loaded on trucks for shipment to the grain dealer) and, thus, the corn had to have been harvested in 1992. The government introduced evidence, through its two experts, that the actual moisture reading patterns obtained from the 45,000 bushels of corn, as reflected on the grain tickets, were indicative of corn harvested from the fields and not from storage bins, and that the moisture reading patterns of the 45,000 bushels of corn, as reflected on the grain tickets, could not have been obtained as James Howard described (by wetting corn in storage and/or rehydrating the corn with a garden hose as it was being loaded (sixty-eight truckloads) for delivery to the grain dealer). The government also introduced evidence demonstrating that adding moisture to the exterior surface of the corn would create highly unstable and unpredictable moisture patterns depending on the temperature, humidity, evaporation, sample taken, and time elapsed, and that James Howard's purported method for storing and rehydrating corn was not practical, logical, or economically beneficial. Stated simply, the government's theory of the case was that, while one could add a small amount of water to a small sample of corn and obtain an increased moisture reading on the Dickey John, one could not add the large amounts of water described by the defendants to 45,000 bushels of corn and obtain the moisture reading patterns as reflected on the grain tickets.

As recognized by the majority, the gist of the defendants' defense centered around an explanation concerning the high moisture reading patterns, as reflected on the grain tickets, for the 45,000 bushels of corn. According to the defendants, the high moisture reading patterns, as reflected on the grain tickets, occurred because they had sprayed water on the 45,000 bushels of corn either during storage and/or dur-

ing the transfer of the corn from storage bins into the trucks (sixty-eight truckloads) used to transport the corn to the grain dealer.

To rebut the government's case and to prove the validity of their defense, the defendants introduced the expert testimony of, and an in-court experiment conducted by, Harold Smith, the grain dealer who purchased the 45,000 bushels of corn and paid the defendants under the false name of Jack Peele. Even though Harold Smith had no knowledge, skill, experience, training, or education sufficient to render an opinion concerning how one could add the large amounts of water described by the defendants to 45,000 bushels of corn and obtain the moisture reading patterns as reflected on the grain tickets, he was permitted to render an opinion establishing this theory.

On direct examination, over the government's objection, Harold Smith opined that the Dickey John "checks the corn from the inside out . . . [and that it] won't check moisture on the outside of the corn." (J.A. 441). Harold Smith also opined that, if you spray water on corn, "it will give enough moisture going inside the corn to raise the thing on the Dickey John." (J.A. 441). Then, after asking Harold Smith whether he had "tested this Dickey John to indicate whether moisture can be increased in the corn," (J.A. 442), defense counsel asked Harold Smith to describe his "tests" for the district court. (J.A. 443). Over the government's continued objection, Harold Smith testified about his tests with using water to increase the moisture level of corn when tested by the Dickey John, describing how adding squirts of water to a corn sample raises the moisture reading of the corn sample. Harold Smith then conducted an in-court experiment which involved using the Dickey John to measure the moisture content of a small sample of dry corn, then spraying water on the small sample of corn, waiting approximately fifteen minutes, and having the Dickey John measure the moisture content of the small sample of wet corn. Through this experiment, the defendants sought to prove that one could add the large amounts of water described by the defendants to 45,000 bushels of corn and obtain the moisture reading patterns as reflected on the grain tickets.

Faced with Harold Smith's expert opinion and experiment, the government, on cross-examination, was forced to discredit Harold Smith, not as a lay witness, but rather as an expert. On cross-examination,

Harold Smith admitted that he had no personal knowledge of farmers adding water to corn to change the moisture level of the corn; that he had no education or training concerning corn; that he did not know what method James Howard used for adding moisture to corn; that he was not aware of any machine that allowed farmers to add moisture to corn by the truckload; and that he did not know how much water was added by the defendants to the 45,000 bushels of corn. Notwithstanding all of this testimony suggesting that he knew nothing about the issue of whether the moisture level of corn could be manipulated in the manner described by the defendants, Harold Smith opined that the minor spraying in his experiment was the equivalent to the contentions of the defendants concerning the "volume of water placed on the corn by use of a garden hose as the corn came from the storage bin via auger to the truck for transportation to the market." (J.A. 550).

Unfortunately for the defendants, Harold Smith was never identified by them as an expert witness and no expert report was provided pertaining to Harold Smith; consequently, his testimony, to the extent he rendered expert opinions, was inadmissible. Fed. R. Civ. P. 26(a)(2). Second, the defendants made no effort to qualify Harold Smith as having the knowledge, skill, experience, training, or education to render expert opinion testimony admissible under Rule 702 of the Federal Rules of Evidence.[1] Moreover, the defendants did not establish, and the district court did not elicit evidence of, any expertise on Harold Smith's part based upon knowledge, skill, experience, training, or education that would qualify him to opine on the issue of whether the high moisture reading patterns as reflected on the grain tickets could have been obtained in the manner described by the defendants. Harold Smith testified that he was not a scientist, that he

---

[1]Rule 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

had no training and little knowledge about the internal characteristics of corn, that he had simply been told how the Dickey John worked, and that he had "mash[ed]" the button on the Dickey John for about twenty-five years. (J.A. 457). Thus, there was no basis upon which Harold Smith legitimately could be qualified as an expert witness on corn moisture or on how one could add the large amounts of water described by the defendants to 45,000 bushels of corn and obtain the moisture reading patterns as reflected on the grain tickets. Accordingly, Harold Smith's testimony, to the extent that it rendered expert opinions, was inadmissible under Rule 702.[2]

In the "Findings of Fact" section of its order, the district court made two findings concerning the testimony of Harold Smith: (1) "[t]he court finds, through the testimony of grain buyer Harold Smith and his demonstration with the actual Dickey John used to measure the moisture content of the disputed 45,000 bushels of corn, that it is pos-

---

[2]Nor was Harold Smith's testimony admissible as the opinion testimony of a lay witness under Rule 701. Rule 701 expressly limits the opinion testimony of non-experts to, *inter alia*, opinions which are "rationally based on the perception of the witness" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. In this case, much of the testimony of Harold Smith was based upon unstated and untested assumptions about the experiment that he was conducting and how his experiment related to what was or could have been done under actual farm conditions. It appeared that Harold Smith could not perceive anything more about his experiment (observing only the exterior of the Dickey John and what appeared to be done to the small corn sample) than the fact-finder and others present. Furthermore, any comparisons between Harold Smith's experiment and what the defendants claimed to have done was not based on reason, but rather, on pure speculation. Harold Smith may have been experienced in the operation of the Dickey John, but the record does not reflect that he had any experience in determining whether one could add the large amounts of water described by the defendants to 45,000 bushels of corn and obtain the moisture reading patterns as reflected on the grain tickets. Harold Smith's expertise regarding pushing the button on the Dickey John proved nothing, but the defendants attempted, through his testimony and experiment, to prove their claim that sixty-eight truckloads of corn (45,000 bushels) were rehydrated to the moisture reading patterns as reflected on the grain tickets.

sible to spray water onto corn and thereby raise the moisture content measurement on the Dickey John," (J.A. 553); and (2) "[t]he afore-mentioned demonstration in the court showed that spraying water on corn with an initial content of 13.8 could raise the moisture level of the corn to approximately 19.5, an increase of 5.7" (J.A. 553). In its "Findings of Fact" section, the district court did not mention any of the government's evidence which demonstrated that, while one could add a small amount of water to a small sample of corn and obtain an increased moisture reading on the Dickey John, one could not add the large amounts of water described by the defendants to 45,000 bushels of corn and obtain the moisture reading patterns as reflected on the grain tickets. Indeed, the district court made no findings concerning the government's two experts.

In its "Conclusions of Law" section, the district court does not mention how the government failed to prove its case; rather the district court stated in relevant part as follows:

> (1)  The plaintiff has failed to meet the requisite burden of proof needed to prove by a "preponderance of the evidence" that defendant made false claims to obtain crop insurance indemnity payments and disaster assistance payments that contained false statements regarding the 1992 crop production and losses.

> (2)  The plaintiff is unable to meet the requisite burden needed to prove by a preponderance of the evidence that defendant obtained the crop insurance indemnity payments and disaster assistance payments by committing common law fraud, mistake of fact theory, the unjust enrichment theory, or the False Claims Act, 31 U.S.C. § 3729.

(J.A. 553-54).

While recognizing that the district court relied in part on Harold Smith's testimony and experiment, *ante* at 4, the majority in this case nevertheless takes the view that we should affirm because the district court did not rely on any of the "objected-to opinion testimony in its

order," *ante* at 5, and, therefore, any error is harmless. With all due respect, the majority has a myopic view of the record.

Throughout the trial and during the district court's colloquy on the defendants' Rule 52(c) motion, the district court seemed to believe that Harold Smith's expert testimony and the results of his experiment destroyed the government's case. *See, e.g.*, (J.A. 513-14) ("through history in this court, this case will be known as the Dickey John case"); (J.A. 514) ("I understand [the government's] expert comments . . . but if there were 12 people sitting in that [jury] box yesterday, . . . when I saw it register 13.8 and then the same corn go back in 15 minutes later after it had been sprayed to 19.5. I mean that is classic evidence to shoot that theory down."); (J.A. 523) ("You going to finish up by telling me why the Dickey John thing shouldn't impress me?"); (J.A. 545) (captioning the case "The Dickey John Case"). Harold Smith's *expert* testimony provided the only evidence that effectively contradicted the testimony of the government's two experts that the reported moisture reading patterns as reflected on the grain tickets for the 45,000 bushels of corn were 1992 production rather than stored corn, harvested in years prior to 1992. Indeed, in the absence of Harold Smith's *expert* testimony, the testimony of the government's two experts that dry stored corn could not be rehydrated to the moisture reading patterns as reflected on the grain tickets would have been uncontroverted. Having cited to and unmistakably relied upon the inadmissible expert testimony, the district court understandably made no mention of the government's experts in its findings of fact. In short, I cannot conclude that the district court's erroneous reliance on Harold Smith's expert testimony was harmless because the district court appears to have been too heavily swayed by Harold Smith's inadmissible expert testimony. For these reasons, I would remand for a new trial.